SNAKE OR PIUTE INDIANS OF FORMER MALHEUR RESERVATION in OREGON v. UNITED STATES.

Appeal No. 10.

United States Court of Claims.

Decided June 2, 1953.

dians, of which We-You-We-Wa appears to have been the principal Chief, with which bands or "Tribe" a treaty, which was never ratified or submitted for ratification, was entered into, under circumstances which will be hereinafter discussed, on December 10, 1868, by J. W. Perit Huntington, Superintendent of Indian Affairs for the Territory of Oregon. This unratified treaty was signed on the date mentioned by Huntington, We-You-We-Wa, Gsha-Nee, E-He-Gant, Po-Nee, Chow-Wat-Na-Nee, Ow-Itz, and Tash-E-Go, Chiefs and Headmen of these bands or "Tribe." Later, in 1869 and subsequently, as will hereinafter appear, these Indians of the seven bands were under the leadership of four Chiefs, We-You-We-Wa (also known as We-Ah-We-Wah), E-He-Gant (also known as E-A-Gan), Po-Nee (also known as Pon-Ee), and Ow-Itz (also known as Owitze).

C. B. McConnell, Burns, Or., and Bernard J. Long, Washington, D. C., for the appellant.

Leland L. Yost, Washington, D. C., A. Dewitt Vanech, Asst. Atty. Gen., Wash., for the appellee.

LITTLETON, Judge, delivered the opinion of the court.

This is an appeal by certain bands or tribe of Snake or Piute Indians of the former Malheur Reservation in Oregon, from a final determination of the Indian Claims Commission adverse to appellant's claim for relief. Appellant Indians are the descendants of seven bands of Snake or Piute In-

In Count I of the petition filed, on behalf of the Indians of the bands or tribe mentioned, with the Commission pursuant to the Indian Claims Commission Act, 60 Stat. 1049, 25 U.S.C.A. § 70 et seq., appellant (herein sometimes referred to as the "We-Ah-We-Wah Tribe") asserted the right to recover on the ground that the United States in 1882 took, without the consent of and without the payment of any compensation to appellant's ancestors, a tract of land comprising the former Malheur Reservation in southeastern Oregon. Appellant claims that this had been exclusively used and occupied at the time of the treaty in 1868, and the taking, and from time immemorial, by appellant's ancestors. Appellant asked judgment in the amount of $3,500,000 representing the alleged value of the land at the time of taking.[1]

1. It is not clear from the pleadings, the briefs or the opinion of the Commission, under which section of the Indian Claims Commission Act this claim is urged. From the language of the Act and the legislative history, this claim could fall under the provisions of Section 2(4), which provides in pertinent part as follows:

"The Commission shall hear and determine * * * (4) claims arising from the taking by the United States, whether as the result of a treaty of cession or otherwise, of lands owned or occupied by

the claimant without the payment for such lands of compensation agreed to by the claimant".

With respect to clause (4) the following statement was made in House of Representatives (79th Cong., 2d Sess.) Report No. 2693, July 27, 1946 (H.R. 4497), at pp. 5 and 6:

"The second of these classifications covers claims arising from the taking by the United States of Indian lands, i. e., lands to which tribal claimants had 'Indian title' or the 'right of occupancy.' Sometimes

In the alternative, appellant Tribe asserted in Count II of the petition that it was entitled to relief under the provisions of Section 2(5) of the Indian Claims Commission Act in that the Government's course of dealings with these bands of Piutes, at the time of and subsequent to the negotiating of the unratified treaty of December 10, 1868, was not fair and honorable. Section 2(5) of the Act provides that the Commission shall hear and determine claims "based upon fair and honorable dealings that are not recognized by any existing rule of law or equity." Appellant left to the determination of the Commission the amount of the award to which it might be entitled if it prevailed under this theory.

A hearing was held before the Commission and evidence was presented by the parties, consisting primarily of official Government documents in the form of letters and reports from various Government officials. Because of the antiquity of the claims, no living witnesses to the events in question could be found. No expert testimony was adduced on the question of aboriginal Indian title, although defendant introduced in evidence portions of anthropological studies in connection with tribal distribution in eastern Oregon. At the close of the hearing, pursuant to Rule 25 of the Commission's General Rules of Procedure, appellant filed its proposed findings of fact, following which appellee filed its objections to appellant's proposed findings and its own proposed findings of fact.

On December 29, 1950, the Commission filed its final determination including its findings of fact. With respect to both counts in appellant's petition, the Commission determined that the appellant was not entitled to recover because it had not established (1) that it had aboriginal Indian title to the land in question, or any determinable portion thereof, and (2) that the

these lands were taken under the guise of unratified treaties, sometimes without any semblance of a treaty. The reinsertion of this classification makes it plain that where claimant can prove sufficient facts within the language of this classification the Commission has full authority to award proper damages therefor."

dealings of the Government with the tribe were not other than fair and honorable.

In the appeal to this court, appellant tribe urges that the Commission has erred in that it failed to make necessary findings of fact concerning much evidence in the record bearing directly on the issues of Indian title in 1868, and fair and honorable dealings. It is appellant's position that the evidence in question is documentary in nature and stands unrefuted, and that had adequate findings been made relative to the relevant and pertinent facts established by such evidence, the Commission's ultimate findings adverse to appellant's claims would not be supported by such evidentiary or basic findings. Appellant accordingly contends that this court should hold that the Commission's ultimate findings, adverse to appellant's contentions on the two issues in suit, are not supported by substantial evidence based on the whole record in the case, or that the case should be remanded for further findings.

Section 19 of the Indian Claims Commission Act provides as follows:

"The final determination of the Commission shall be in writing, shall be filed with its clerk, and shall include (1) its findings of the facts upon which its conclusions are based; (2) a statement (a) whether there are any just grounds for relief of the claimant and, if so, the amount thereof; (b) whether there are any allowable offsets, counterclaims, or other deductions, and, if so, the amount thereof; and (3) a statement of its reasons for its findings and conclusions."

Section 20(b) of the Act of August 13, 1946, 25 U.S.C.A. § 70s, sets forth the scope of this court's review of the final determinations of the Commission. It provides that this court shall have exclusive jurisdiction to affirm, modify, or set aside such

The taking alleged herein was not by treaty, ratified or unratified, but by the Government's act in discontinuing the Malheur Reservation and opening the lands to public sale and settlement without first extinguishing the alleged possessory and occupancy title of the Piutes thereto.

final determination and that the court may at any time remand the cause to the Commission for such further proceedings as it may direct. With respect to the Commission's findings of fact and conclusions of law, the section provides in part as follows:

"* * * On said appeal the Court shall determine whether the findings of fact of the Commission are supported by substantial evidence, in which event they shall be conclusive, and also whether the conclusions of law, including any conclusions respecting 'fair and honorable dealings', where applicable, stated by the Commission as a basis for its final determination, are valid and supported by the Commission's findings of fact. *In making the foregoing determinations, the Court shall review the whole record or such portions thereof as may be cited by any party, and due account shall be taken of the rule of prejudicial error.*" [Italics supplied.]

This court had occasion to examine and consider the problem of our scope of review of the Commission's findings of fact in the case of Osage Nation of Indians v. The United States, 97 F.Supp. 381, 119 Ct. Cl. 592, certiorari denied 342 U.S. 896, 72 S.Ct. 230, 96 L.Ed. 672. We noted there, 119 Ct.Cl. at pages 612–613, 97 F.Supp. 381, that the language used in section 20(b) was similar to that of the Administrative Procedure Act, 60 Stat. 237, 5 U.S.C.A. § 1001, which fact was specifically noted in the Conference Report on the Indian Claims Commission Act (Cong.Rec. 7–27–46, p. 10454). See also House Report No. 2693, 79th Cong. 2d Sess., p. 8, where it is stated that "* * * in deference to the position taken by the Department of Justice * * * appropriate amendments were made in sections 20(b), * * * which apply to the Commission the forms of review embodied in the recently enacted Administrative Procedure Act." In the Osage case, we also discussed the then recent decisions of the Supreme Court in Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456, and National Labor Relations Board v. Pitts-

burgh S. S. Co., 340 U.S. 498, 71 S.Ct. 453, 95 L.Ed. 479, in which the court held that the judicial review provisions of the Administrative Procedure Act, and similar language in the Taft-Hartley Act, 29 U.S. C.A. § 141 et seq., require that *substantiality* be determined in the light of *all* that the record *relevantly* presents. In the Pittsburgh S. S. case, the Court stated, 340 U.S. at page 502, 71 S.Ct. at page 456:

"* * * The court [U.S.C.A., 6th Cir.] painstakingly reviewed the record and unanimously concluded that the inferences on which the Board's findings were based were so overborne by evidence calling for contrary inferences that the findings of the Board could not, on the consideration of the whole record, be deemed to be supported by 'substantial' evidence."

In the Osage case, we discovered error in one of the basic findings of fact on which an ultimate finding was based. We concluded that the true meaning and significance of the document, which was the subject of the basic finding in question in that case, required a different finding to be made and the finding required by such document had the effect of withdrawing substantial support for the ultimate finding which had been made on the issue involved.

In the instant case the appellant has not raised any serious objection to the basic or evidentiary findings of facts actually made by the Commission and our review of the whole record persuades that in general they are accurate. The error urged by appellant as to both counts of its petition is that the findings inadequately present the essential facts established by the whole record and that the whole record, while it may contain support for the few basic findings made, does not support the ultimate findings of the Commission on the two principal issues in the case.

At the outset, it should be noted that, as in the matter of the scope of this court's review under the Act of August 13, 1946, supra, the Administrative Procedure Act, supra, contains a provision similar to Section 19 of the Indian Claims Commission Act, quoted above. Section 8 of the Pro-

cedure Act, 5 U.S.C.A. § 1007, relative to "Decisions" in "cases in which a hearing is required", provides in subparagraph (b) as follows:

" * * * · All decisions * * * shall become part of the record and include a statement of (1) findings and conclusions, as well as the reasons or basis therefor, upon all the material issues of fact, law, or discretion presented on the record; and (2) the appropriate rule, order, sanction, relief, or denial thereof."

Prior to the passage of the Administrative Procedure Act in 1946, it appears to have been settled law that where enabling legislation required a *quasi-judicial* body to conduct hearings and render decisions including findings of fact, ultimate or inferential findings and conclusions had to be supported by basic or evidentiary findings which adequately reflected the essential facts of record. Courts of appeals have applied this rule to trial courts sitting without a jury, and where such basic findings were lacking, the appellate courts have usually declined to pass on the validity of the trial court's final determinations and have remanded the cause for the making of adequate basic findings. The reasons for this course of procedure and the necessity for basic findings have been stated many times by the Supreme Court, by the Circuit Courts of Appeals, and by Federal District Courts reviewing decisions of such *quasi-judicial* tribunals as the National Labor Relations Board, the Interstate Commerce Commission, Federal Trade Commission, etc.

In the frequently cited case of Saginaw Broadcasting Co. v. Federal Communications Commission, 68 App.D.C. 282, 96 F. 2d 554, certiorari denied Gross v. Saginaw Broadcasting Co., 305 U.S. 613, 59 S.Ct. 72, 83 L.Ed. 391, one of the issues before the Commission was whether the granting of a license to the plaintiff company would serve the public interest, convenience or necessity. The Commission made a finding in the negative on this issue and the plaintiff appealed, assigning as one of the errors the Commission's failure to make sufficient findings of fact from the evidence adduced at the hearing. With respect to the Commission's ultimate finding that the granting of the license would not serve the public interest, etc., the Court of Appeals said, 96 F.2d at page 560:

" * * * An affirmative or negative finding on this topic would be a finding of ultimate fact. This ultimate fact, however, will be reached by inference from basic facts, such as, for example, the probable existence or non-existence of electrical interference, in view of the number of other stations operating in the area, their power, wave length, and the like. These basic facts will themselves appear or fail to appear, as the case may be, from the evidence introduced when attentively considered."

The Circuit Court noted that the Communications Act, 47 U.S.C.A. § 151 et seq., required the Commission to file a full statement in writing of the facts and grounds for its decision as found and given by it; that Section 402 (a) of the Act provided that a review by the court should be limited to questions of law, *and that findings of fact by the Commission, if supported by substantial evidence, should be conclusive.* The court then proceeded to discuss the reasons for the requirement, sometimes made by statute and sometimes by court rules or decisions, that courts, and commissions acting in a *quasi-judicial* capacity, make findings of fact, and stated, 96 F.2d at page 559, as follows:

"The requirement that courts, and commissions acting in a quasi-judicial capacity, shall make findings of fact, is a means provided by Congress for guaranteeing that cases shall be decided according to the evidence and the law, rather than arbitrarily or from extralegal considerations; and findings of fact serve the additional purpose, *where provisions for review are made,* of apprising the parties and the reviewing tribunal of the factual basis ·of the action of the court or commission, so that the parties and the reviewing tribunal may determine whether the case has been decided up-

on the evidence and the law or, on the contrary, upon arbitrary or extralegal considerations. When a decision is accompanied by findings of fact, the reviewing court can decide whether the decision reached by the court or commission follows as a matter of law from the facts stated as its basis [2], and also whether the facts so stated have any substantial support in the evidence. In the absence of findings of fact the reviewing tribunal can determine neither of these things. The requirement of findings is thus far from a technicality. On the contrary, it is to insure against Star Chamber methods, to make certain that justice shall be administered according to facts and law. This is fully as important in respect of commissions as it is in respect of courts." [Italics supplied.]

The Court also discussed the necessary content of findings of fact and said, 96 F.2d at page 559:

"* * * it will be helpful to spell out the process which a commission properly follows in reaching a decision. The process necessarily includes at least four parts: (1) evidence must be taken and weighed, both as to its accuracy and credibility; (2) from attentive consideration of this evidence a determination of facts of a basic or underlying nature must be reached; (3) from these basic facts the ultimate facts, usually in the language of the statute, are to be inferred, or not, as the case may be; (4) from this finding the decision will follow by the application of the statutory criterion."

As support for its holding that a reviewing court cannot properly exercise its function where the findings of basic facts are lacking or are inadequate, the Circuit Court of Appeals referred to certain decisions of the Supreme Court which discussed what findings of fact were necessary in reports of the Interstate Commerce Commission. The Court of Appeals further noted that Section 14 of the Interstate Commerce Act, 34 Stat. 589, 49 U.S.C.A. § 14 (1934), required only that the report of that Commission state its conclusions unless damages were to be awarded, but that the Supreme Court had nevertheless required the Commission to make substantial findings of basic and essential facts necessary to support its decisions, despite the absence of statutory requirement for such findings.[3]

2. See United States v. Penn Foundry & Mfg. Co., 337 U.S. 198, 69 S.Ct. 1009, 93 L.Ed. 1308, where this court had made complete findings of fact on the basis of the record but where, upon reviewing those findings, the Supreme Court held that the decision reached by this court did not, as a matter of law, follow from the facts so found. There was thus no impediment to the court's exercising its function of review, and it reversed the decision of this court.

3. In United States v. Baltimore & Ohio R. Co., 1935, 293 U.S. 454, 55 S.Ct. 268, 79 L.Ed. 587, the Supreme Court found a complete absence of the basic or essential findings necessary to support the Commission's order. In State of Florida v. United States, 1931, 282 U.S. 194, 51 S.Ct. 119, 75 L.Ed. 291, the issue was whether the interstate rates in force resulted in "unjust discrimination as against interstate commerce". In passing upon the Commission's ultimate finding in the affirmative, the Supreme Court remanded the case for the making of ba-

sic findings, suggesting, without directing, what those findings might be, and stating, 282 U.S. at page 215, 51 S.Ct. at page 125:

"The question is not merely one of the absence of elaboration or of a suitably complete statement of the grounds of the Commission's determination, to the importance of which this court has recently adverted * * * but of the lack of the basic or essential findings required to support the Commission's order. In the absence of such findings, we are not called upon to examine the evidence in order to resolve opposing contentions as to what it shows or to spell out and state such conclusions of fact as it may permit. *The Commission is the fact-finding body, and the Court examines the evidence not to make findings for the Commission but to ascertain whether its findings are properly supported.*"

See also United States v. Chicago, M., St. P. & P. R. Co., 294 U.S. 499, 55 S.Ct. 462, 79 L.Ed. 1023; Kewanee & G. R. Co. v. Illinois Commerce Commission, 340

550

In United States v. Morow, 87 U.S.App. D.C. 84, 182 F.2d 986, the suit by plaintiff was brought against the United States under the Federal Tort Claims Act, 28 U.S. C.A. §§ 1346(b), 2402, for personal injuries and damage to her car in a collision with a United States Marine Corps truck. The District Court had rendered a judgment for the plaintiff. The Circuit Court of Appeals held that the District Court was under a misapprehension as to the last-clear-chance doctrine of the State of Virginia and that under a proper interpretation of that doctrine, the findings of the District Court were not sufficiently comprehensive. The Court of Appeals stated that there was evidence in the record not made the subject of findings which might well have supported the District Court's conclusion that plaintiff was entitled to recover but the Appellate Court declined to so hold and remanded the case to the District Court, stating, 182 F.2d at page 989:

"The findings of the District Court are not sufficiently comprehensive to warrant us in directing the entry of judgment for the defendant United States or in affirming the judgment for the plaintiff on the basis of evidence not made the subject of findings of the District Court."

In Interstate Circuit, Inc., v. United States, 304 U.S. 55, 58 S.Ct. 768, 769, 82 L.Ed. 1146, the Court held that the ultimate conclusions stated in the lower court's decree that "the parties had engaged in an illegal conspiracy" was not properly supported by findings of basic facts in the record and that the opinion of the court below was not a substitute for the required findings even though it contained a discussion of portions of the evi-

dence not made the subject of basic findings.[4]

In Kelley v. Everglades District, 319 U. S. 415, 420, 63 S.Ct. 1141, 1144, 87 L.Ed. 1485, the issue was the *fairness* of the allotment of revenue from different sources to different classes of creditors asserting prior claims. In remanding the cause to the District Court which had confirmed the plan for composition of the debts of the respondent as fair, equitable and not discriminatory, the Supreme Court held that the ultimate finding of fairness which is in its nature inferential, was not supported by sufficient findings of basic facts, stating:

"To support such determinations, there must be findings, in such detail and exactness as the nature of the case permits, of subsidiary facts on which the ultimate conclusion of fairness can rationally be predicated."

In The E. A. Packer, 140 U.S. 360, 11 S.Ct. 794, 35 L.Ed. 453, the Court held that whether a collision of two vessels was due to the fault of one or the other amounted to a legal inference from other facts and should not be inferred from a finding of a single material fact tending to show fault on the part of one vessel, where there was uncontradicted evidence in the record of other facts tending to show either that this fault did not contribute to the collision, or that there were contributing faults upon the part of the other vessel. The Court held that the record justified findings requested by appellant and remanded the case.

The Supreme Court has found occasion in certain cases to remand decisions of this Court for inadequacy of basic find-

Ill. 266, 172 N.E. 706; and Atchison, T. & S. F. R. Co. v. United States, 295 U.S. 193, at pages 201, 202, 55 S.Ct. 748, at page 752, 79 L.Ed. 1382, in which the Court stated:

"This court will not search the record to ascertain whether, by use of what there may be found, general and ambiguous statements in the report intended to serve as findings may by construction be given a meaning sufficiently definite and certain to constitute a valid basis for

the order. In the absence of a finding of essential basic facts, the order cannot be sustained."

See also Atlanta & St. Andrews Bay Ry. Co. v. United States, D.C., 104 F. Supp. 193.

4. In its opinion in the instant case, the Indian Claims Commission has alluded to certain facts in the record which it apparently considered relevant but which were not made the subject of any findings.

ings. In Seminole Nation v. United States, 316 U.S. 286, 651, 62 S.Ct. 1049, 1055, 86 L.Ed. 1480, the Court noted "ample indications in the record" of facts which, in its opinion should have been made the subject of basic findings. After discussing the evidence of record which it considered relevant and the proper subject for basic findings, the Court remanded the case for further findings, stating, 316 U.S. at page 300, 62 S.Ct. at page 1056:

"We do not say that all this establishes liability on the part of the Government for it is not our function, in reviewing judgments of the Court of Claims, to make basic findings of fact. When the Court of Claims fails to make findings on a material issue, it is proper to remand the case for such findings. Cf. Universal Battery Co. v. United States, 281 U.S. 580, 584, 585, 50 S.Ct. 422, 423, 74 L.Ed. 1051."

Upon remand, this court reexamined the record, held further proceedings, and after making findings, held that the evidence did not justify a conclusion that the United States knew of the corruption of, and knowingly paid money to, corrupt chiefs for the benefit of the tribe. 102 Ct.Cl. 565, certiorari denied 326 U.S. 719, 66 S. Ct. 24, 90 L.Ed. 426. See also United States v. Esnault-Pelterie, 299 U.S. 201, 57 S.Ct. 159, 81 L.Ed. 123.

In considering the question of the adequacy of findings of quasi-judicial tribunals which have been held subject to Section 8 (b) of the Administrative Procedure Act, the courts have been careful to state that detailed findings of every subsidiary evidentiary fact is not required. Thus, in affirming an order of the Interstate Commerce Commission complained of as lacking the necessary evidentiary findings of fact to support its final determination, the District Court stated in

Capital Transit Co. v. United States, 97 F.Supp. 614, 621:

"* * * Here the facts and policies upon which the Commission proceeded are fully set forth. There appears to be no omission in the Commission's statement which is in any way prejudicial to complainant. There is not lacking any element, either as to findings of fact or considerations of policy, necessary to support the present order of the Commission.[5]"

We are of the opinion that the principles defined and discussed in the above-mentioned decisions [6] with respect to the necessity for basic or evidentiary findings of fact which adequately reflect the whole record and provide an adequate basis for ultimate findings and for final determinations of quasi-judicial commissions subject to the Administrative Procedure Act, to District Courts sitting without a jury, and to the Court of Claims, are equally applicable to the determinations of the Indian Claims Commission.

In applying the above principles, we first direct our attention to the nature of the ultimate findings or conclusions reached by the Commission on the issues raised in Counts I and II of this case.

In Count I, the issue is whether appellant exclusively used and occupied in the Indian manner, to the exclusion of all other tribes or bands, the land in question or some definite part of it, not only at the time of the alleged taking or deprivation of use, but for a long time prior thereto. This issue of Indian title is the same issue, among others, which was before this court under a special act in the case of Alcea Band of Tillamooks v. United States, 59 F.Supp. 934, 103 Ct.Cl. 494, affirmed 329 U.S. 40, 67 S.Ct. 167, 91 L.Ed. 29. A finding that the plaintiffs Tilla-

5. See also Norfolk Southern Bus Corp. v. United States, D.C., 96 F.Supp. 756. In United States v. Pierce Auto Lines, 327 U.S. 515, 66 S.Ct. 687, 90 L.Ed. 821, the Court found that a certain necessary and basic finding had been made, although inartistically, and that there was evidence to support it.

6. For a further discussion of this and related problems, see 146 A.L.R. 209 ff.

mooks, et al., had "Indian title" to the land in question was arrived at only after a thorough and careful consideration of many types of evidence which were made the subject of basic findings. Also, in the case of Pawnee Indian Tribe of Oklahoma v. United States, Ct.Cl., 109 F.Supp. 860, we had occasion to consider what facts might be established in order to support a finding of Indian title in a tribe. The problem of establishing such exclusive occupancy title by immemorial possession as of a date too remote to admit of testimony of living witnesses, and where no deeds or patents exist, is not a simple one. At best, the ultimate fact of beneficial ownership by exclusive possession and occupancy can only be *inferred* and found from many separate events and a variety of documentary material such as reports of early explorations, maps by explorers or Government engineers, reports of military expeditions, letters and contemporaneous reports of Government representatives writing from the areas in question, annual reports of the Secretaries of War prior to 1849, and of the Secretaries of the Interior after that date, Senate and House Executive documents, contemporary newspaper articles, evidence of an expert type from anthropologists and historians, correspondence in the records of various Government departments and officials with reference to or having a bearing on the tribe or the area in question, and, in fact, anything having any relevance which can be unearthed. The fact of original Indian title in a tribe at an ancient date requires a great deal of proof, and the essential evidentiary facts shown by that proof, insofar as they are relevant, should find their way into carefully prepared findings of fact in support of whatever ultimate finding regarding title is justified thereon.

With respect to Count II, a finding respecting fair and honorable dealings is even more clearly in the nature of an inference to be drawn from all the relevant evidentiary or basic facts bearing on the *entire course of dealings between the parties*. And it is for the Commission in the first instance to make findings concerning all such facts as may appear in the record so that we may know precisely upon what basis the ultimate factual inference is made. See Kelley v. Everglades District, supra. That something or someone is or is not fair or honorable is always a conclusion or an inference based upon many factual considerations. It is seldom that in a course of dealings over a long period of years, a single event will be determinative of whether, in the last analysis, a person has or has not acted fairly and honorably.

■ A review of the entire record in this case persuades us that in the light of the issues raised in both counts, the Commission's findings of fact are insufficient. It is not the function of this court to make findings of fact, but merely to review the findings and decision of the Commission under the principles outlined above. Neither should this court undertake to anticipate what the conclusion of the Commission might be as a result of the making of additional findings. If, upon reconsideration of the whole record and the making of additional evidentiary and basic findings, the Commission decides that appellant has established Indian title by exclusive occupancy and possession, to some or all of the land in question, the question raised in Count II on fair and honorable dealings will not be pertinent, for appellant can have but one recovery.

Inasmuch as the Commission has found adversely to appellant on both counts, we shall discuss and analyze to some extent the Commission's findings and opinion respecting both issues for the purpose only of indicating wherein we think them to be insufficient for the purposes of our review on appeal.

### Count I

■ Appellant's claim to Indian title is in certain respects unique. Claiming as the descendants of the bands who in 1868 appear to have been under the leadership of the Piute Chief We-Ah-We-Wah and certain other chiefs and headmen who signed the unratified treaty of December 10, 1868, appellant urges that those bands had used and occupied, to the exclusion of

other tribes and bands, at the time of the treaty and for a long time prior thereto, land in the vicinity of Lake Malheur and Harney in southeastern Oregon. The appellant tribe does not appear to contend that the area of land so occupied was precisely that included within the boundaries of the later established Malheur Reservation, defined and created by Executive Order, but rather that it was in that vicinity and included at least that area of land. The implication seems to be that the area claimed to have been owned was actually much larger than the reservation and that it included therein the lands set apart and used as the original Malheur Reservation, but that due to the lack of evidence of exact boundaries, appellant is willing to accept compensation for the lesser area included in the Executive Order reservation. The indefiniteness of appellant's claim respecting the whole country they were supposed to have occupied and possessed does not seem to have troubled the Commission which apparently took the view that if, within that large and indefinite area, the tribe could establish by satisfactory proof its exclusive occupancy and control as to a smaller and definable part, a justiciable claim was presented. Under the circumstances of this case, we think that the Commission's attitude was both reasonable and eminently fair.

In determining that appellant had not established its claim of Indian title to the area of land included within the boundaries of the Malheur Reservation, the Commission noted in its findings and opinion the following facts and circumstances which it considered to be relevant.

Until 1860 little was known by the white people or by the Government of the Snake or Piute Indians of southeastern Oregon except that they were a nomadic, nonvillage type of Indian. Little was known about the boundaries, if any, between the areas habitually ranged over by the various bands of Indians in that area in search of their livelihoods. (Findings 1, 3, and 4.) Pursuant to the Act of March 25, 1864, 13 Stat. 37, authorizing the President to negotiate treaties for the purchase of lands from the Snake Indians and from the Klamath and Modoc Indians in southeastern Oregon, treaties of cession were negotiated and ratified in the case of the Klamath and Modocs in 1864 [7] and with the Woll-Pah-Pe Tribe of Snake Indians in 1865.[8] The Commission noted that the lands ceded by those tribes included part of the land later set aside for the Malheur Reservation and now claimed by appellant tribe as having belonged to its ancestors. (Finding 4.) The remaining non-treaty bands of Snake or Piute Indians in southeast Oregon, including the bands of appellant tribe, remained hostile to the whites and it was not until after their defeat by the United States Army under General Crook, that a council looking toward a treaty could be held with them. A treaty of peace and friendship was concluded by Superintendent Huntington, on behalf of the United States, and by seven Piute chiefs of the bands of appellant tribe at Fort Harney on December 10, 1868. Aside from the stipulations regarding the keeping of peace, the seven bands of Indians agreed by this treaty to reside upon such reservation as might thereafter be allotted to them. The treaty further stipulated that the United States would guarantee to protect their persons and property while they were upon such reservation; that future provisions would be made by the Government for the permanent location of the Snakes, their education, government, food, clothing, and allotment of lands in severalty when their advancement warranted it. Article 7 provided that this treaty was only preliminary to a more complete treaty to be made at a later date. This treaty was never ratified nor was it ever submitted for ratification, and no other treaty was ever consummated by and between the parties. (Finding 5.)

The Commission found that a further council was held with the Snakes or Piutes the following year (1869) and that there were present at such council Su-

---

7. Treaty of October 14, 1864, 16 Stat. 707.

8. Treaty of August 12, 1865, 14 Stat. 683.

554

perintendent Meacham, representing the Indian Office, Colonel Otis and two other officers of the United States Army, four of the chiefs who had originally signed the 1868 treaty,[9] together with the chiefs of three other bands, not parties to this suit, i. e., Chock-Tote, O-Che-Ho and Teh-Ah-Ne. The purpose of this council during 1869 was to persuade the chiefs mentioned to remove with their bands to the Klamath Reservation in southern Oregon. All refused to do so except O-Che-Ho and Chok-Tote. (Finding 6.)

In March 1871, Superintendent Meacham recommended to the Commissioner of Indian Affairs that an area of land located between the forty-second and forty-fourth parallels of latitude and between the 117th degree and 120th degree of longitude, be withdrawn for eighteen months with a view to selecting an Indian reservation on which could be consolidated Indians east of the Cascade Mountains. (Finding 7.) By Executive Order dated March 14, 1871, the land in question was withdrawn. On September 12, 1872, an Executive Order set aside as a reservation "for the Snake or Piute Indians" the area previously withdrawn (Finding 8) and in the Fall of 1873, various roving bands of Indians in southeastern Oregon and adjacent areas in Nevada and Idaho, other than appellant bands or tribe, were collected by defendant and placed on the reservation which was known as "Malheur." (Finding 9.)

From these facts, the Commission concluded in an ultimate finding that the appellant Piute bands or tribe who signed the 1868 treaty, did not have Indian title by exclusive occupancy and possession to any of the land included in the Malheur Reservation. (Findings 16 and 17.)

In its opinion the Commission found significant the facts that the unratified treaty of December 10, 1868, was not a treaty of cession; that it did not promise the Indians a reservation at any particular location; and that such treaty was never ratified. The Commission referred to the fact that there were a number of general statements in the record by the Indians and by Government agents referring to the territory in southeast Oregon as "Snake country," but stated that the only reference to the location of any particular band was in the report of Colonel Otis, wherein he stated that the bands under We-Ah-We-Wah (one of the chiefs signing the 1868 treaty) roamed principally on the headwaters of the Malheur river and Stein Mountain country, i. e., in the vicinity of the land claimed in this action. The Commission did not identify the general statements referred to, nor did it make any evidentiary or basic findings on those statements nor concerning Colonel Otis' letter.

In further support of its conclusion, the Commission stated that the selection of the Malheur area for a reservation was motivated solely by the fact that this particular area was well adapted to reservation purposes, and was in no sense an indication that the United States believed that this land belonged to appellant's ancestors or to any band of Indians. In this connection, the Commission suggests that the selection of this specific land for a reservation was merely fortuitous. It is not clear from the Commission's findings and discussion, from what evidentiary material it drew the conclusion as to the Government's motives in selecting this particular land except for a reference to Superintendent Meacham's letter of March 8, 1871 (Finding 7), in which he stated that the reservation was to be used for the purpose of consolidating thereon "Indians east of the Cascade Mountains." The Commission adds that the designation of this reservation as one for the "Snake or Piute Indians" in Commissioner Walker's letter of September 4, 1872 (Finding 8. (a) ), and also in the Executive Order of September 12, 1872 (Finding 8 (b) ), was without significance.

Without passing at this time upon the correctness of the Commission's conclu-

9. The record indicates that the followers of the seven chiefs who signed the 1868 unratified treaty had, by 1869, consolidated under the leadership of the four chiefs who attended the 1869 council.

sion that the record does not justify a finding of aboriginal Indian title in appellant's ancestors to the land in question or to any portion of it, we shall discuss some of the evidence in the record which, insofar as the findings and opinion reveal, was not deemed to be of importance by the Commission, but which we believe to be relevant on the issue of Indian title.

As previously stated, proof sufficient to establish Indian title at an ancient date is complicated and difficult, and careful consideration must be given to all relevant facts and circumstances. In view of the intention of Congress, as manifested by the liberal provisions and the history of the Indian Claims Commission Act, to deal fairly and justly with Indian groups, band or tribes, much weight should, we think, be given to such evidence as contemporaneous statements of authorized Government representatives in the area in question and to official reports and records respecting the location of the land and the nature of the Indians' occupancy and possession, i. e., whether regarded at the time as exclusive or not. Consideration also should be given to the statements of the Indians themselves as contained in the recorded minutes of councils held with Government representatives. During and long prior to 1868 Government agents and officials seem to have had a clear conception of the nature and character of Indian possessory title and the type of occupancy necessary to show such title. Government officials had been dealing with Indian bands and tribes in connection with such matters since as early as 1785.

The fact that the 1868 treaty was not in express terms a treaty of cession but was merely one of peace and friendship, seems to have been very persuasive in the conclusion reached by the Commission that the Government never considered this land to have been the established home of the bands under the chiefs who signed that treaty. In that connection it appears to us that considerable light is thrown on the Government's motives and action by the letter of instructions issued to Superintendent Huntington on June 22, 1864.

These instructions (Claimant's Exhibit 9) were issued by Acting Commissioner of Indian Affairs Mix, pursuant to the Act of March 25, 1864, supra, which act authorized the President to negotiate treaties with the Klamath, Modoc and Snake Indian tribes in Southeastern Oregon, for the purchase of the country occupied by them. Appellant bands were in that group and resided in the area where the Malheur Reservation was established. The sum of $20,000 was appropriated by Congress for this purpose to be expended under the direction of the Secretary of the Interior. Appellant's ancestors who were parties to the 1868 unratified treaty were among the Snake bands covered by that Act. The letter of instructions indicates that the negotiation of a treaty of peace and friendship such as the one negotiated with the seven Piute chiefs in 1868, was not necessarily indicative of the fact that the Indians did not have possessory Indian title to any lands in that area or that the United States did not believe these Indians had any land to cede. The letter stated that the Government was then hard pressed financially because of the great expense of conducting the Civil War, and urged the treaty negotiators to be as economical as possible in carrying out the instructions. The letter reads in part as follows:

"It is not the policy of the Government to admit title in the wandering tribes of Indians upon the Pacific Coast, and unless you find insuperable difficulties, I would advise that the treaty should be one of peace and friendship and an agreement on the part of the Indians to reside upon a proper reservation to be selected and distinctly marked, with an agreement on the part of the U. S. to provide them with such necessary supplies [sic]. Farmers & Merchants as will enable them to submit [sic] and advance in civilization so as to be able to take care of themselves. If, however, you find it necessary to negotiate for the exclusive possession of any part of the country which they occupy to enable our people to devel-

op its mineral productions or avail of its agricultural resources, care should also be taken in that case that the boundaries of the portion retained by the Indians should be clearly defined, if possible, by natural land marks and that within its limits there should be such natural resources as will enable the Indians with but little assistance from the Government, and for a time but little departure from their ordinary pursuits to obtain a livelihood and which shall also be as far removed as possible from White settlements and least liable to be intruded upon by white settlers. The territory retained should also be adapted to grazing and agricultural pursuits so that when in the course of time they shall be reclaimed from their present wild and barbarous methods of life and induced to turn their attention to more civilized pursuits, there will be no necessity for a new treaty and their removal to a new country.

"In this connection I invite your attention to the inclosed copies of correspondence from late Superintendent Agent Steel [California], and especially to his remarks in relation to the character of the treaty which should in his judgment be negotiated, these remarks commend themselves to me as being of practicable value, nevertheless I have thought it proper in view of communications from you dated respectively Dec. 8 '63 March 4th & 28 '64 to leave the question as to whether the proposed treaty shall be one of cession, or merely of peace and friendship to the discretion of yourself and associates. In either event you are carefully to avoid any extravagant stipulations in favor of the Indians."

Within a few months of the writing of the above letter, Superintendent Huntington negotiated the treaty of October 14, 1864, with the Klamath and Modoc and Yahooskin Band of Snake Indians, and on August 12, 1865, he negotiated a treaty with the Woll-Pah-Pe Tribe of Snakes. Both treaties were treaties of cession, but

whether this was so because of "insuperable difficulties" encountered by the Government negotiators in their attempts to avoid purchasing the land as they were instructed to do, or because the United States required the particular land "to enable our people to develop its mineral productions or avail of its agricultural resources," we are not informed. The documents relating to those treaties in the files of the Office of Indian Affairs, National Archives, might provide the answers. The record in this case does indicate a well known Government policy, evidence of which we have encountered in the records of other Indian cases, i. e., that of extinguishing by means of treaties of cession possessory Indian title to described areas of land and creating of treaty reservations, where it was contemplated that the land ceded would be soon needed by white settlers, by railroad companies (Osage case, supra), or for the use of emigrant Indian tribes whom the Government desired to resettle (Pawnee case, supra). If land claimed by an Indian tribe was not immediately needed by the Government for those or similar purposes, the Government would frequently attempt to negotiate treaties of peace and friendship which often included the granting to the Government by the tribe of rights of way over their lands with the boundaries of the lands claimed by the tribe set forth in the treaty. See Northwestern Bands of Shoshone Indians v. United States, 95 Ct. Cl. 642, 100 Ct.Cl. 455, affirmed 324 U.S. 335, 65 S.Ct. 690, 89 L.Ed. 985, which involved positive instructions to treaty commissioners concerning the type of treaty to be negotiated and which also involved a strictly legal claim under a special jurisdictional act, as distinguished from a use and occupancy title.

Under the Klamath and Modoc treaty of cession, the Indians ceded an area of land and a treaty reservation was established for them in their "home country" on Klamath Lake for the future home of the tribe. In the Woll-Pah-Pe treaty, land was ceded and the tribe agreed to move to the Klamath Reservation to live. Parts of the lands ceded under these two treaties,

and which presumably became a part of the public domain, were later withdrawn and included within the boundaries of the Malheur Reservation in 1872.[10]

In the June 22, 1864, letter of instructions to Huntington, Acting Commissioner Mix called attention to inclosed copies of correspondence from "late superintendent Agent Steel, and especially to his remarks in relation to the character of the treaty which should in his judgment be negotiated * * *." The Steel correspondence referred to may be found in the Records of the Indian Office in the National Archives. Steel was Superintendent of Indian Affairs for the Territory of California. In a letter to Commissioner of Indian Affairs Dole, dated March 8, 1864, Steel described the Snakes as a very numerous tribe of "roving proclivities." Respecting the type of treaty that should be negotiated with these bands, Steel stated:

"A treaty with them * * * is not required for immediate settlements, [and] should be only for their own good behaviour and the right of way and grazing on. In any case the principle of presents and stipulations for purchase should be avoided as the presents only tend to impress the indians with a belief of their superior power and our cowardice and whenever they desire a new outfit, they will make an outbreak with a view to a new treaty and further presents."

Having fulfilled his instructions with respect to the Klamath and Modoc and the Woll-Pah-Pe tribes, Huntington had the remaining problem of negotiating with the Snake or Piute bands who, as pointed out above, were wild, numerous, and of "roving proclivities." These bands did not take kindly to the intrusion of the white men into their home country, and it was not until after they had been defeated in 1868 by the United States Army under the Command of General Crook who had waged a lengthy and vigorous military campaign against these bands, that Huntington was able to meet with the chiefs and headmen of these bands and carry out his 1864 instructions.

Subsequent to the defeat above mentioned, the now destitute Indians were collected on or near various military reservations in Oregon and on or about December 10, 1868, Superintendent Huntington held a council with seven Piute Chiefs and Headmen at a camp near Fort Harney. (Camp Harney was on land later included in the land designated and set aside as the Malheur Reservation.) Apparently Superintendent Huntington had no difficulty in negotiating with the destitute and defeated Piutes the type of treaty which his 1864 instructions indicated would be most acceptable to the Government, i. e., a treaty of peace and friendship with an agreement on the part of the Indians "to reside upon a proper reservation to be selected and distinctly marked" and an agreement "on the part of the U. S. to provide them with such necessary supplies." Considered as a whole, were the course of dealings and the negotiation and provisions of the 1868 treaty sufficient to lead appellant bands to think or believe that a recognized or treaty reservation would be established for them in their home country where they had long lived?

Documents in evidence indicate that the land claimed by appellant bands or tribe was not good agricultural land and, at that time, was not sought after by white settlers. These factors certainly eliminated the necessity of purchasing or extinguishing Indian title, if any, to the land claimed by these Indians, and it is apparent that the bands of half-savage and thoroughly conquered Piutes could not raise any "insuperable difficulties" to the negotiation of a simple treaty of peace. However, they did exact from Huntington a promise that another treaty would subsequently be negotiated with them, which was never done. That the appellant's ancestors were completely terrified by the white military forces at whose hands over two-thirds of their number had been killed, is manifest from the documents in evidence. Although no min-

10. No mention is made in either the Commission's findings of fact or in its opinion, concerning this letter of instructions.

utes of the treaty council of December 10, 1868, have been found, other documents in the record indicate that the seven Piute chiefs made no attempt to bargain with the United States representatives concerning the terms of the treaty, or the establishment at that time of a treaty reservation, perhaps because a subsequent treaty was promised, and except that they doubtless expressed a desire to be allowed to remain in the area which they claimed as their own country, i. e., the area around Fort Harney where the treaty was signed and where the subsequent council with Superintendent Meacham was held a year later.

The record shows that in the November 1869 council with Superintendent Meacham, the four surviving Indian chiefs, then representing the seven bands who had signed the 1868 treaty, stated that Superintendent Huntington had promised them at the council held in connection with that treaty, that the reservation promised in that treaty would be located "in their own country" near Fort Harney. Meacham had in his possession at that council the manuscript of the 1868 treaty and he made the four chiefs acknowledge their signatures thereto. He constantly referred to the treaty as obligating those four chiefs to remove to the Klamath Reservation in southern Oregon which had been selected by the Government as the future abode of the Piutes. Just as consistently throughout the council of several days, those four chiefs of appellant bands referred to Huntington's "promise" and refused to remove to Klamath.

In view of the evidence discussed above, the question arises whether it is reasonable to infer or conclude, as did the Commission, that the negotiation of the 1868 treaty of peace and friendship, rather than a treaty of cession, is a conclusive or even a strong indication that the Government representatives did not believe the Piutes to have occupied a definable area of land around Fort Harney.

As to the Commission's conclusion that the selection of the Malheur area for a reservation was motivated solely by the adaptability of that area for Indian reservation purposes, and not because the Government believed the land to be the home of the seven bands of Piutes who were parties to the 1868 treaty, we think the Commission might wish to consider further several of the documents in evidence which seem to indicate rather that the Government representatives considered the Malheur location as singularly *unadaptable* for Indian reservation purposes.

According to Superintendent Huntington's report of December 22, 1868 (Claimant's Exhibit 10), it would seem that the only conceivable reason for establishing a reservation for the Piutes in the Malheur area was because that area was the home country of the Piute or Snake bands who had participated in the 1868 treaty negotiated by Huntington a few days previously, and such reservation would therefore be most acceptable to those Indians. As an Indian reservation for which the Government would be responsible, Huntington pointed out the following drawbacks: the climate was cold, the land was generally unfavorable to agriculture, timber was scarce, and the cost of transporting all the necessary supplies to the area around Fort Harney would be extremely high. Huntington stated that the only advantage to the area as a reservation lay in the fact that it was the Snake's "own country" and would involve no very great expense of removing them "and it will be more satisfactory to them than to remove [them] to some distant locality with which they are unacquainted."

Huntington stated that his first choice of a reservation for appellant's ancestors was the already established Siletz Reservation on the Pacific coast of Oregon (which had been established in 1855) and his second choice was the Klamath Reservation in southern Oregon, established in 1864. Although Klamath had already been established, Huntington pointed out that it was so near to the Piute's "own country" that there would always be the problem of the Piute's wandering off and "going home." He observed that Siletz had the advantage of being so far from the home country of the Piutes that they could not return. As we have seen, the four chiefs who had participated in the treaty of December 10, 1868, positively refused to leave their "own country" around Fort Harney when they

were asked to do so by Superintendent Meacham in the 1869 council.

The Commission has made no findings to support the conclusion in its opinion that the selection of Malheur as a reservation was motivated solely by the adaptability of the land to reservation purposes. We agree with the Commission that this consideration is an important one in connection with appellant's claim of Indian title to this land, and we feel that a finding should be made respecting the Government's reasons for selecting this particular site rather than settling the Piutes on Klamath or Siletz. In making such a finding, however, the documents to which we have alluded should be carefully considered.

Of significance in evaluating appellant's claim that the land in the Malheur Reservation was in fact the exclusive homeland of the Piute bands whose chiefs signed the 1868 unratified treaty, is the evidence concerning the behaviour and activities of the other bands who were entitled to reside on the Malheur Reservation when it was established but who had not participated in the 1868 treaty negotiations. At the 1869 council with Superintendent Meacham, only those chiefs who had been parties to the 1868 treaty insisted on a reservation in the Malheur area. O-Che-Ho's and Chock-Tote's bands, not parties to the 1868 treaty, consented to and did remove to the Klamath Reservation in southern Oregon. The record indicates that their reason for so doing was that the Klamath Reservation was located nearer to the country which they considered to be their own than was the country around Malheur. A letter, dated April 15, 1872, from Major Hunt to the Assistant Adjutant General at Portland, Oregon (Claimant's Exhibit 14), indicates that O-Che-Ho's "old country" was in the vicinity of Warner Lake which was a short distance southeast of the Klamath Reservation, and close to the Nevada and California northern boundaries. The same letter indicated that Chock-Tote's old country was likewise in the vicinity of the Klamath Reservation.

After the Malheur Reservation was established by Executive Order, the seven bands of Piutes, whose chiefs had signed the 1868 treaty, went on the reservation voluntarily and remained there until the outbreak of the Bannock war. Other bands who were entitled to reside on the reservation and whom the Government wanted settled thereon, had to be rounded up and persuaded to go on the reservation. Some bands successfully resisted the Government's efforts to locate them on Malheur and never did live on the reservation. Chief Winnemucca and his band finally went on the reservation but Winnemucca never felt he received the respect to which he was entitled from the other chiefs, and his followers became dissatisfied with the treatment they received and began leaving the reservation in 1877 to return to their old haunts elsewhere in Oregon and in Nevada. Subsequent to the military occupation of the Malheur Agency in the summer and fall of 1878, the reservation was reopened for use as an Indian reservation and the Government for several years attempted to persuade all the bands of Indians who had been entitled to reside there, except appellant's ancestors who had been taken as prisoners to Yakima, to return to Malheur, but none of them ever consented to do so. Accordingly, since the seven bands of Indians who were parties to the 1868 treaty were never allowed to go back to Malheur, and the Indians who did not sign the treaty did not wish to go back, the reservation was discontinued by the Government. Finally, it may be significant that it was the Piute bands, or some of them, who had signed the 1868 treaty, who ultimately found their way back from Yakima to the border of the land claimed by appellant bands to have been their home, and they settled around Burns, Oregon, on the edge of the former Malheur Reservation where, until recent years, they have lived in abject poverty and without any material assistance from the Government. Their nontreaty cousins whose homes were originally elsewhere, went to other Indian reservations where they were apparently well cared for and some even received allotments of land in severalty. Whether or not the possession of appellant bands of the Malheur area or some part of it was ever exclusive, their attachment to

that land and their occupancy of it as their home was sufficient to induce them to follow the tragic course indicated in this record. History shows that the home ties of Indian tribes to certain areas where they had lived for a long period of years were very strong.

For whatever weight it may have as evidence, the record herein seems to indicate that it was appellant's ancestors, who signed the 1868 treaty, who (1) insisted on the proposed reservation being located at Malheur which they then claimed as their home and which, in the 1869 council they positively insisted was their home; (2) who went willingly on to the reservation to live as soon as it was established; (3) who remained on the reservation until the outbreak of the Bannock war although, other bands of nontreaty Piutes either became dissatisfied and left prior to that time, or never consented to go on the reservation at all, preferring to remain in the vicinity of various areas of country which they considered their own; (4) who wished and asked consistently to be allowed to return to Malheur; and (5) who finally returned to that area to live in poverty without formal Government aid for many years. The record also indicates that Winnemucca's band, O-Che-Ho's and Chock-Tote's bands did not at any time claim the Malheur country, or any part of it, as their own, and had no attachment to it or desire to live there.

■ In conclusion, we suggest that the fact that part of the land contained in the Malheur Reservation boundaries was included in the descriptions of the areas ceded to the United States by the Klamaths and Modocs and the Woll-Pah-Pe tribes of Indians, does not necessarily establish non-ownership of those lands by the ancestors of appellant. As the Commission is no doubt aware, it often happened that land purchased by the Government from one band of Indians during the early days of the Government's contact in an area, was later discovered to have belonged to a neighboring tribe. On some such occasions it was found necessary by the Government to purchase the possessory title of some part of the same land again from that neighboring tribe.

■ Because of the insufficiency of the Commission's findings on Count I, we conclude that the determination of the Commission should be set aside and that the cause should be remanded for further consideration and the making of additional findings which will more completely reflect the relevant facts disclosed by the record. If, after considering such evidence and making additional findings, the Commission should arrive at a different result with respect to Count I, it will not, of course, be necessary for it to reconsider the facts relating to Count II.

## Count II

In this count, appellant asserts its right to an award, the amount to be determined by the Commission, on the ground that appellant has been damaged by defendant's failure, under all the facts and circumstances, to deal fairly and honorably with appellant's ancestors. It is appellant's position that the Government was under a moral obligation, at least, to carry out the expressed and necessarily implied promises made by it, through its authorized representative, in the unratified treaty of December 10, 1868, and that the record discloses that the Government has failed to do so in all respects. In its petition, filed with the Commission, appellant made specific and detailed allegations concerning the actions of the United States in its relations and dealings with these seven bands of Indians, and appellant here urges that at the hearing before the Commission, it introduced evidence on each allegation sufficient to warrant a favorable conclusion on this count.

■ A determination of whether or not a course of dealing by the United States with and in relation to bands or a tribe of Indians was in the last analysis fair and honorable, can be made only after a very thorough and careful consideration not only of what was actually done, but also of that which was not done and of the motives and circumstances surrounding and underlying the overt acts of the parties, and their intentions, etc. It is often the case that an action which, on its face, appears to be cruel or shocking to the conscience, may, when examined and analyzed in its complete con-

text, be found to have some moral justification which either mitigates or eliminates entirely the apparent cruelty of the action. The evidentiary facts based on the circumstances establishing such justification, or the lack of it, are facts as indispensable on the issue of fair and honorable dealings, as the bare facts of the dealings themselves.

In its findings of fact and opinion, the Commission has discussed some, but not all, of what the record establishes were the actual actions of the parties. It has discussed what it infers to have been the Government's motives behind its actions. The Commission then concluded that from the point of view of actions and motives, the Government had behaved in a fair and honorable manner toward the Piutes, and the Commission placed the blame for the Piutes' admittedly tragic history directly at the door of the Indians themselves. In so doing, the Commission made no findings concerning the motives or reasons behind the specific acts of the appellant bands to which the Commission referred and characterized as culpable, nor did it discuss in its opinion what, if any, reasons the Piutes had for pressing the claims which they made during and after 1868, and for doing what they did.

In its petition, on the question of fair and honorable dealings, the appellant not only alleged the various acts of the United States and of the seven Piute bands during the period in question, it alleged the reasons motivating those acts and the circumstances which it believed justified the course of action taken by the tribe. At the hearing, appellant introduced documentary evidence to establish its allegations and the Government likewise introduced evidence to establish its freedom from blame. In its findings and opinion the Commission has said practically nothing of appellant's evidence on the matter of motive and justification, and has apparently resolved all doubts in favor of defendant.

The case as presented by the Commission's findings of fact and opinion exonerating defendant from all taint of blame in its dealings with the Piutes will be summarized. In this summary, and in a discussion of the facts in the record relevant on the issue of fair and honorable dealings, a number of which facts were apparently not deemed of much weight by the Commission in reaching its ultimate conclusion, it will sometimes be necessary to repeat, in aid of clarity, certain portions of the evidence heretofore referred to.

The Commission found that appellant's ancestors were savage and nomadic Indians, who, with other bands also known as Snakes or Piutes, ranged over a large area in southeastern Oregon. Pursuant to the Act of March 25, 1864, 13 Stat. 37, the President (as hereinbefore stated with respect to Count I), was authorized to conclude treaties with the Klamath and Modoc tribes and with the Snake Indians in southeastern Oregon, for the purchase of the country occupied by them. Treaties of cession were concluded with the Klamath and Modoc Tribes in 1864, and with the Woll-Pah-Pe Tribe of Snakes in 1865. These Indians were all placed on the so-called Kamath Reservation which was a treaty reservation established out of the Klamath cession and was located on Klamath Lake near the southern border of Oregon. These Indians, therefore, owned this reservation. The Government was at that time unable to conclude a treaty with the remaining bands of Snakes or Piutes who inhabited the area adjacent to those cessions because of the determined hostility of those bands to the white man. The Commission does not explain the reason for that hostility, but the record indicates that these wild, roving bands bitterly resented the intrusion of the whites in their country and sensed in that intrusion a real threat to their Indian way of life, and they undertook to defend it. In 1866 an aggressive military campaign was undertaken against them by the Army, under the command of General Cook, which resulted, in 1868, in the complete defeat and surrender of these Indians.

In the fall of 1868, Superintendent of Indian Affairs for Oregon, J. W. P. Huntington, visited the various bands of defeated Snakes, who had been collected in camps near Army posts in southeast Oregon. Huntington finally held a council with the chiefs and headmen of these Indi-

ans at a camp near Fort Harney, in 1868, and negotiated a treaty which provided that hostilities between the whites and the Snakes would cease and no penalties would be inflicted on either side; that the Snakes would acknowledge the dominion and authority of the United States and its laws; that any infringement of the laws by white or Indian would be punished according to United States or Oregon law. In Article 4 the Snakes agreed to reside upon such reservation as might be thereafter allotted to them and to obey the authorities lawfully placed over them, and the United States in turn guaranteed to protect the persons and property of the Snakes while they were on the Reservation. This treaty did not define the reservation to be established. In Article 5, however, it was provided that future provisions would be made by the United States for the permanent location of the Snakes, for their education, government, food, clothing, and the allotment of lands in severalty to them when their advancement warranted it. Article 7 provided that the treaty was only preliminary to a more complete treaty "to be made hereafter under the direction and authority of the Government of the United States."

The above treaty was signed by the parties on December 10, 1868, but was never ratified. The Commission found that no further attempt was ever made to make a further treaty with these Indians.

The Commission next found that in November 1869, Huntington's successor, Superintendent Meacham, and Colonel Otis, held a council with Chiefs We-Ah-We-Wah, E-E-Gan, Pon-Ee, and Ow-Itz, who had signed the 1868 treaty, and O-Che-Ho, Chock-Tote and Teh-Ah-Ne who had not been parties to the treaty, for the purpose of persuading them to move to the Klamath Reservation to reside, but all of them except O-Che-Ho and Chock-Tote declined to move. In its opinion, the Commission characterized this refusal to move to Klamath as the first act of bad faith or breach of the unratified treaty on the part of the ancestors of appellant, i. e., those bands who had signed the 1868 treaty. No mention was made by the Commission of the reasons the chiefs of the seven bands who

had signed the 1868 treaty may have had for their refusal.

The Commission next found that on March 8, 1871, Superintendent Meacham wrote to the Commissioner of Indian Affairs recommending that the President withdraw for eighteen months a described area of land in the vicinity of Lake Malheur "with a view of selecting an Indian reservation, on which to consolidate Indians east of the Cascade Mountains in said State," and requesting the President to instruct Meacham to proceed at the earliest possible time to select such reservation. The Commission noted that this recommendation was approved, and by Executive Order dated March 14, 1871, the land was withdrawn. On September 4, 1872, Commissioner of Indian Affairs, Walker, wrote to the Secretary of the Interior enclosing a report of Superintendent Odeneal with reference to a "proposed reservation on the headwaters of Malheur River * * * for the Snake or Piute Indians." Walker recommended that a described tract be set apart and reserved as an Indian reservation. On September 12, 1872, the President signed an Executive Order setting apart as a reservation "for the Snake or Piute Indians" the lands as recommended by the Secretary of the Interior.

In its opinion, the Commission states that despite the designation of the reservation in the Executive Order as one for the "Snake or Piute Indians," the establishment of the reservation was in no way connected with the unratified treaty entered into with the seven Snake chiefs on December 10, 1868, and was certainly not a fulfillment of the promise therein to establish those Indians on a permanent reservation. The Commission seems to imply further that the selection of this particular site as a reservation was without significance in connection with appellant's ancestors, since, according to the Commission, there was apparently no discussion between the United States representative and the seven Piute chiefs concerning any particular land as being claimed by them as their home.

The Commission found that beginning in 1873, various roving bands of Indians in southeastern Oregon and adjacent areas in

Nevada and Idaho were collected by defendant and placed on the Malheur Reservation just established, and that by 1878 the total number of Indians on the reservation was 846.

In its opinion the Commission states that in the summer of 1878, the Snakes on Malheur who "appear to have been getting along satisfactorily" on the reservation, "voluntarily abandoned that reservation in June 1878, at the beginning of the Bannock War and joined the Bannocks in fighting against the United States in violation of their promises under the treaty of 1868."

The Commission found that in the winter of 1878–79, following the defeat of the Piutes and the Bannocks, the hostile Piutes of the Malheur Reservation, and the non-hostile band under the leadership of Chief Leggins, were removed with their families by the military and taken to the Yakima Indian Reservation in Washington for permanent settlement. In its opinion the Commission stated that the resentment of the white settlers in the vicinity of Malheur resulting from the hostilities and the depredations of the Piutes during the Bannock war, motivated the Government's decision to move these Indians to Yakima. Also in its opinion (but not in the findings of fact), the Commission stated that at Yakima the Piutes were provided with the same care and opportunities offered on all Indian reservations at that time; that at first they were satisfied with life at Yakima, and that they could have remained there indefinitely if they had so wished.

The Commission found that in January 1880, a delegation of Piutes headed by Chief Winnemucca [11] visited Washington, D. C., and obtained permission from the Secretary of the Interior for the return to Malheur of all the Piute Indians who had formerly lived there. However, on June 25, 1880, this permission was rescinded insofar as it related to those Piutes at Yakima. In its findings, the Commission stated that the reason for the rescinding of the permission was the receipt in Washington, D. C., of reports to the effect that if the Piutes at Yakima attempted to make the trip back to Malheur, the Indians would be in great danger from the whites who still resented the activities of the Piutes in the Bannock war. In its opinion the Commission also states:

"It must be admitted that the policy adopted by the Government with reference to keeping the Piutes at Yakima or permitting their return to the Malheur Reservation is somewhat obscure. * * *"

The Commission then concluded that "in justification of the course the defendant pursued," such course was undoubtedly followed out of concern for the safety and welfare of the Piutes.

The Commission found that the Malheur Agency on the reservation was reopened by the Indian Service in late 1878 and was kept open until September 13, 1882; that during such time the Government agent in charge made repeated efforts to persuade those Piutes in the vicinity of the Malheur Reservation who had not been taken to Yakima, to return and settle on the Malheur Reservation, but to no avail. The Commission does not explain the reasons for such refusal, nor what bearing that circumstance has on appellant's case on fair and honorable dealings with respect to the Government's treatment of appellant's ancestors who were those Piutes who were forced to remain at Yakima.

The Commission found that in 1882, when it became apparent that no Indians were going to live on the Malheur Reservation, the President issued an Executive Order (September 13, 1882), canceling the reservation and restoring the lands to the public domain. Subsequently, the Piutes at the Yakima, Washington, reservation began to leave. Some of them later turned up at various Indian reservations in Nevada and Idaho. A substantial group, composed chiefly of appellant bands, appeared at Burns, Oregon, on the edge of the former

11. Chief Winnemucca's band of Piutes were not living at Malheur at the outbreak of the Bannock war, had not joined in the hostilities, and were not taken to Yakima.

564

Malheur Reservation. Those Piutes (including Leggins band) who settled on other reservations have been cared for by the Government. Those who settled around Burns, the Commission stated have had some care in the past few years.

The Commission concluded, using the unratified treaty of 1868 as a starting point, that the Government in good faith attempted to keep its promises made therein, although it was under no legal obligation to do so, but that its efforts were continuously thwarted by the bad conduct of the Indians themselves, first, in refusing to settle on the Klamath Reservation, next in voluntarily leaving the Malheur Reservation at the outbreak of the Bannock war, although they had been well treated on Malheur, and finally by joining the Bannocks in hostilities against the whites. The Commission justified the Government's refusal to permit the Piutes at Yakima to return to Malheur while it was still operated as a reservation by stating, as above mentioned, that such refusal was solely out of concern for the safety of those Piutes. The Commission does not attempt in its findings or opinion specifically to justify the Government's failure to compensate the Piutes in any way for their loss of the Malheur Reservation (as a matter of fair and honorable dealings), apparently on the theory that by the time the reservation was abolished, the Piutes had forfeited all right to any consideration from the Government.

On the basis of the facts as stated by the Commission, it would not be unreasonable to conclude, as the Commission has done, that the Government had in good faith attempted to live up to any moral obligations imposed on it by the unratified treaty of 1868, and that the Piutes by their unreasoning stubbornness, uncooperativeness, disloyalty and open hostility, had forfeited all right to further consideration. However, our review of the record in this case indicates to us that there is considerable evidence therein which places a different complexion on the behaviour of the parties. The facts established by this evidence are, we think, relevant and should have been considered in more detail in reaching a determination concerning the fairness of the Government's treatment of these Indians and the degree of blame attributable to them. In the absence of specific findings on this evidence, we cannot say that it was given the degree of consideration which should have been given to it by the Commission in reaching its decision. It is not our province, at this stage, to search the record and make the basic evidentiary findings required by such evidence. That is the function of the Commission. However, following the procedure stated in the decisions referred to earlier in this opinion, we shall indicate briefly and in general the nature of some of the evidence which we think should be further considered by the Commission.

The Huntington report of December 22, 1868, referred to briefly by the Commission in finding 5, seems clearly to indicate that the establishment of a reservation, later known as the Malheur Reservation, had a very definite connection with the treaty Huntington had negotiated with those Indians only a few days previously. The report also indicates that the area ultimately selected for the reservation, or some part of it, was acknowledged by the Government to be on land claimed as home, at least by those seven bands of Piutes who had signed the 1868 treaty. In discussing the various sites which would be suitable for a reservation, Huntington observed that the site most acceptable to these Indians would be in the vicinity of Camp Harney (which was located in the area later included in the Malheur Reservation) for the reason that this country was their home. After discussing the expense that would be involved in establishing a new Agency on such a reservation and the high freight rates, Huntington turned to a consideration of the merits of Klamath and Siletz as a location for these Indians. Klamath, already established as a reservation, was rejected by him as being too close to the Piute's own country so that the Indians would undoubtedly return "home" if they did not like life at Klamath. He finally recommended Siletz on the Pacific coast of Oregon as the most suitable place from the point of view of expense and, most important of all, because it was too far from

their own home country, near Fort Harney, to permit of the Piutes' return. Huntington's report indicates also that at that time the Piutes were defeated, destitute, in no position to bargain, and completely at the mercy of the Government.

Huntington's report of December 22, 1868, described in detail the treaty he had just negotiated with the seven bands of Piutes, whose home he stated was in the Malheur area. Immediately following his discussion of the treaty, Huntington's report took up the selection of a site for a reservation to be established for the use of the seven bands with whom he had just negotiated. In view of the fact that the treaty contained a promise on the part of the Government to provide these Indians with a treaty reservation, we do not see how the two things—the treaty and the Malheur Reservation—can be said to have no connection with each other.

The 1868 treaty was never ratified, and no further attempt was ever made to make a further treaty with these Indians although it seems obvious that both parties then intended and believed that such further treaty would be made at some later date, as specifically provided in Article 7 of the unratified document.

On August 10, 1869, Superintendent Huntington's successor, Superintendent Meacham, wrote to the Commissioner of Indian Affairs reminding him of Huntington's report of the previous December, and the fact that Huntington was to have met with the Piutes again in the spring of 1869 but had been unable to do so. Meacham stated that upon Huntington's failure to ment with the Piutes as promised, they had returned to their old haunts to fish and gather roots. Meacham urged that he be given authority and funds to place those Indians on a reservation, preferably the Klamath Reservation, and that he be immediately authorized to promise them much needed assistance, saying: "They must be assisted and controlled or they will go again on the war path to prevent starvation."

On November 8, 1869, Superintendent Meacham opened council with seven Piute chiefs, four [12] of whom had signed the 1868 unratified treaty. The United States Army was prominently represented at the council which lasted for several days. Although the minutes of the council are in evidence, the only reference to them made by the Commission is that the council was held for the purpose of persuading the Piutes to move to the Klamath Reservation and that all the chiefs except O-Che-Ho and Chock-Tote refused to do so. In its opinion, the Commission characterized this refusal as a breach by the Piutes of their unratified treaty promise to reside on any reservation selected for them by the United States. Thus, the Commission concludes, the Government's good faith efforts to fulfill its treaty stipulation with respect to a reservation home for the Piutes was thwarted at the outset by the Piutes themselves.

The Council minutes in evidence establish the following facts. At the outset, Mr. Meacham produced a manuscript which he said was the treaty signed by the seven Piute chiefs, and by Mr. Huntington, on behalf of the Government, the year before. He required each of the four chiefs present who had signed the treaty, to identify and acknowledge his signature. This was done. Meacham then informed the Chiefs that it was the desire of the Indian Commissioner (who, Mr. Meacham emphasized, was an Indian) that the Piutes should remove at once to the Klamath Reservation to live permanently. Meacham described the reservation and the manner of life on it, and asked the Chiefs if they could consent to live there. All the Chiefs present who had signed the 1868 treaty immediately refused, explaining that Mr. Huntington who had signed the treaty for the Government, had promised them that they should have a reservation in "their own country"; that they had never supposed they would have to go elsewhere; that if they could remain in their own country, they would ask little else and would permit the whites to come

12. We-Ah-We-Wah, E-E-Gan, Pon-Ee, Ow-Itz, Chock-Tote and O-Che-Ho were not parties to the treaty. Chief Winne- mucca was not a party to the treaty and was not present at the 1869 council with Meacham.

566

upon their lands at will and would keep the peace. Superintendent Meacham made no secret of his anger at this response and he accused the Chiefs of having been told by someone—either a half-breed or a white man—not to go ot the Klamath Reservation to live. Meacham reminded the Chiefs of their great sufferings at the hands of the Army under General Crook, the fact that the bands were now a defeated and dependent people, and he warned them that their refusal to do as they were told might have dire consequences. He pointed out that the Klamath Reservation was "near your own country" and that he, Meacham, had recommended it as a home for their bands for that very reason instead of the distant Siletz Reservation. Meacham's remarks clearly indicate that *he* was aware, also, that the country around Lakes Malheur and Harney was the home country of the bands who had signed the 1868 treaty.

Meacham finally decided to await the return of Chief Winnemucca, whom he believed to have considerable influence with the other Chiefs, before proceeding with the council. On November 10, 1869, Chiefs O-Che-Ho and Chock-Tote told Meacham that they were willing to go with their bands to reside on the Klamath Reservation. Neither of those chiefs had signed the 1868 treaty. Another document in evidence [13] reveals that the reason for the acceptance by Chiefs O-Che-Ho and Chock-Tote of Klamath as their home was that it was located much closer to their old haunts in southern Oregon on the California and Nevada borders than was the region around Fort Harney which the Piute Chiefs, who had signed the 1868 treaty, claimed as their country and desired as a reservation.

On November 16, Chief Winnemucca not having returned, a final meeting was held with the remaining Piute Chiefs, and despite Meacham's thinly veiled threats, the Chiefs of appellant bands continued to refuse to move to the Klamath Reservation and begged for permission to stay in the Malheur and Harney vicinity and have a reservation established there.

Following this council, nothing more was done about the bands whose chiefs had signed the 1868 treaty, and presumably they continued to live and hunt in the country around Lakes Harney and Malheur which they considered their own. On March 3, 1871, Congress passed an Act prohibiting the making of any further treaties with Indian tribes, 16 Stat. 544, 566, and this circumstance effectively terminated any possibility of ratification of the 1868 treaty or the making of a further treaty as promised in Article 7 of the unratified treaty.

In a report dated September 19, 1872, Superintendent Odeneal stated, among other things, that if the selection of a new reservation in the Malheur area was approved, the Snakes in the vicinity of Camp Warner would go there willingly and be satisfied as that particular region was their old home.

On the basis of these additional facts, the Commission may wish to re-examine its findings and conclusions that the refusal of the Chiefs who signed the 1868 treaty to leave their home and go to live at Klamath was, in the circumstances, unreasonable and a breach of their "obligation" under that unratified treaty. The question might be asked—Did the Government really fulfill its moral obligations under that agreement or treaty?

The next "reason" or "motive" evidence which should be examined concerns the Piutes' reasons for joining with the hostile Bannocks in 1878. The Commission stated, as hereinbefore set forth, that the Indians on the Malheur Reservation were apparently getting along quite satisfactorily, and the inference seems to be that no circumstances existed which could be said to explain, let alone justify, the sudden hostility of the Piutes.

From the annual reports (Claimant's Exhibit 15) of the Commissioner of Indian Affairs, which included the reports of the two men who were Agents at the Malheur Reservation from 1874 through 1878, it appears, however, that conditions on that reservation were far from satisfactory from

13. Major Hunt's letter of April 15, 1872, Claimant's Exhibit 14.

the Indians' point of view. The re for each year point out the failure o Government to build houses for the Indians, who were therefore required to continue to live in the same manner as they had from time immemorial. The agents pointed out that unless a gristmill was built, there was no inducement for the Indians to start farms and raise grain. It appears that despite the fact that a Department regulation required that no rations be issued unless a certain amount of work was done by the Indians, tools and facilities for the Indians to work with were not supplied by the Government and it was accordingly impossible for the Indians to do the required work. The agents reported that most of the Piutes had proved themselves to be good workers, and the agents pointed out in particular the good work done by the Indians in constructing an irrigation system on the reservation. In his report of August 1, 1878, Agent Rinehart stated that although $80,000 was required to run the Malheur Reservation properly, the appropriation for the reservation had started out at $50,000 and had decreased each year until in 1878 it was but $15,000. He warned the Department that the Indians on Malheur were becoming increasingly dissatisfied and restless because of the delays in the arrival of supplies and the scarcity of the supplies when they did arrive; because of the Government regulations which reduced Indian wages to 50 cents a day (the Indians could then make $1.00 a day away from the reservation); because of the regulations which prohibited the selling of horses to Indians and required the Indians to exchange their ponies (an Indian's most precious species of property) for cattle, sheep or hogs; and finally, because of the regulation prohibiting the issuance of rations to visiting Indians.

The same reports tell of the constant trespassing on the reservation lands by white stockmen in the vicinity and the fact that the number of cattle being illegally grazed on the reservation increased every year. We think the Indians were rightly disturbed by this situation. When a Government order was finally issued for the removal by the stockmen of their cattle from the reservation, the settlers urged that the western portion of the reservation on which they had been trespassing be severed from the reservation and opened to settlement. The agent reported:

"To avoid probable unpleasant complications between settlers and Indians, resulting from this conflict of interests, I recommended to the Department, on May 20, a proposition from settlers to lease the coveted portion of the reserve for a term of five years, at a rental of $1,500 a year."

Other reports in evidence indicate that many of those Indians who had never claimed the Malheur country as their home, left the reservation in 1877 and 1878 because of the unsatisfactory conditions existing thereon and because, despite the lack of facilities with which to perform work, they were required to work in order to become entitled to receive their rations. Apparently the reservation had little to offer these Indians except, in the case of the bands or tribe who signed the 1868 treaty, an opportunity to remain unmolested in their own country. We call attention particularly to the report of Agent Parish, dated September 2, 1875, and the reports of Agent Rinehart dated August 12, 1876, and August 14, 1877, contained in the annual reports of the Commissioner of Indian Affairs for those years and in evidence as part of complainant's Exhibit 15. (We call attention particularly to pages 174 and 175 of Exhibit 15.)

At the conclusion of Agent Rinehart's annual report dated August 1, 1878 (Claimant's Exhibit 15), in which he describes the Bannock outbreak, the following statement appears:

"In a conference with their leader, Chief Egan, he informed Mr. Scott, of Camp Harney, just before the outbreak, that they [the Indians at Malheur] knew they would be subdued— that there were not enough Indians to whip all the whites—but he would fight as long as he could, *and then he thought the Great Father at Washington would give him more supplies, like he did when they quit fighting before,*

*and not try to make his people work."* [Italics supplied.]

From this and similar evidence not discussed herein, the questions arise: (1) Was the Government at fault in the manner in which it treated the Piutes and conducted the Malheur Reservation? (2) Were the Piutes at all justified in joining the Bannock hostilities in 1878, bearing in mind the fact that they were still semi-civilized, ignorant, and, by the admission of their own agent, in a near destitute condition?

We consider next the Commission's justification of the Government's actions in refusing to permit the treaty bands of Piutes at Yakima to return to Malheur. In a letter dated October 27, 1881, Mr. Wilbur, then Indian Agent at Yakima, informed the Commissioner of Indian Affairs (Claimant's Exhibit 18) that upon learning that the permission granted to the Piutes at Yakima to return to the Malheur Reservation was qualified to the extent that the trip must be made "without expense to the Government for transportation," he refused to allow the Piutes to start out. This we think, was a wise move on his part. He pointed out that the Piute group was composed of nearly 200 children, many women and infirm men, and that these people had neither provisions nor horses to enable them to make the long trip. Wilbur stated that in view of the great distance to be traversed, and the hostility of the whites along the route, the proposed trip would have been suicidal for the Indians.

Instead of providing the Piutes at Yakima with the horses and provisions and protection necessary for the trip back to Malheur, the Government rescinded the permission, and in a letter dated November 18, 1881, the Commissioner of Indian Affairs advised the Secretary of the Interior (Claimant's Exhibit 18) that these Piutes would never be allowed to return to Malheur but must consider Yakima as their permanent home. The record establishes that in the meantime white settlers and their representatives in the Oregon Government were continually pressing the Government in Washington to return the Malheur Reservation lands to the public domain and declare them open to settlement by homestead and pre-emption. The settlers in the immediate vicinity of the reservation had already practically taken over all the grazing lands and were not removed by the Government. No jury in Oregon would convict a white settler of trespass on this Indian reservation. Those other Indians, not members of the bands or tribe who signed the 1868 treaty, but who were entitled to live on Malheur and who had left it before the Bannock war, did not take advantage of the continuing offer to them of using the Malheur Reservation as a home. Various reasons for their refusal are established by the evidence. These Indians had never claimed the Malheur area as their home and had no attachment to the place. Many of them had settled around military posts at Camp McDermit in Nevada and Fort Bidwell in California, where the settlers paid them $1 a day for labor and encouraged them to stay there rather than to return to a reservation that at all times had been inadequate to meet their needs. The white people at Camp McDermit and Fort Bidwell warned the Indians that the trespassing settlers in the vicinity of the Malheur Reservation would surely resist the Indians' resettlement thereon. All these facts were called to the Government's attention by its representatives in the Indian service in Oregon, who recommended that under the circumstances it would seem best for the Government to discontinue Malheur as a reservation. The Yakima Indian Agent reported that the Piutes had never been welcomed at his reservation by the Yakima Indians, who, in fact, actively resented the Piutes' presence there. He recommended that the Piutes be permitted to leave Yakima, or at least to escape.

In finally recommending to Congress the wisdom of discontinuing Malheur as an Indian reservation, the Commissioner of Indian Affairs consistently advised Congress that the land comprising this reservation should be sold and the proceeds devoted to the care of the Piute Indians.[14] This recommendation was doubtless based

14. Claimant's Exhibit 15, Annual Reports of the Commissioner of Indian Affairs for 1880 and 1881.

upon the recognition of the fact that this area was the home country of at least most of these Piute Indians, and, also, upon his considered opinion that such a course of dealing would be fair and honorable. When this recommendation regarding the sale of the Reservation was not followed, but instead the land was opened to free settlement under the homestead and pre-emption laws, the Commissioner of Indian Affairs in his 1882 Annual Report (Claimant's Exhibit 15) noted that his recommendation to sell the land and devote the proceeds to the use of the Indians "for whose use and occupation it was set apart" had not been followed. He stated that the action taken by Congress was "in response to most urgent and persistent appeals on the part of the people of Oregon for restoration of these lands to the public domain, in order that they might become subject to settlement under homestead and pre-emption laws."

The reservation was not all returned to the public domain at the same time and it was again recommended by the Indian Office that the remaining portion be sold and the proceeds devoted to the care of the Piutes, but this was not done and ultimately the whole area was returned to the public domain and none of it was sold for the benefit of the Snake or Piute Indians. This ended forever any attempt, which in reality had never been made, to determine, what, if any, area of land had in 1868 and prior thereto been occupied and possessed by the seven bands of appellant tribe.

Finally, the record contains evidence of the abject and destitute condition of the Piutes while they were living at Yakima.[15] Following the extinguishment of the Malheur Reservation, the Piute bands at Yakima (except Leggins Band) wandered away and finally most of them returned to the

vicinity of their old home and settled around Burns, Oregon, where they are to this day. The record discloses that until very recent years their condition at Burns was deplorable. The Indian Claims Commission commented upon the fact that these Indians are now receiving some Government aid, but nothing was said about their condition or treatment prior to the past few years.

As stated in the Saginaw Broadcasting Co. case, supra, it is not the function of this court to make findings of fact on appeal. Since the Commission's findings appear to be inadequate on much of the relevant evidence in the record, it is impossible for us properly to review its conclusions. Accordingly, the determination of the Commission on Count II relative to fair and honorable dealings is set aside; and the cause is remanded to the Commission for further consideration and the making of additional findings which will fairly reflect the relevant basic facts established by the evidence in the record.

In conclusion, we believe that the findings of the Commission on both counts are not sufficient to warrant us in either affirming or reversing the Commission's final determination, when viewed in the light of the evidence in the record not made the subject of findings of fact by the Commission. We accordingly set aside the Commission's final determinations on both Counts I and II, and remand the causes to the Commission for further consideration and the making of basic findings in accordance with the principles discussed in this opinion.

It is so ordered.

JONES, C. J., and HOWELL, MADDEN, and WHITAKER, JJ., concur.

---

15. In a report, dated February 16, 1882, from the Commissioner of Indian Affairs in response to a Senate resolution of January 30, 1882, calling for information regarding the Malheur Reservation, it was stated that the Piutes who had been removed to Yakima were contented, industrious, greatly interested in the plans for their progress, and that their children were doing well in the Yakima schools. The reports of the Yakima Agent for the period in question, indicated the precise contrary. See also the letter of Brig. Gen. Miles, dated January 7, 1882 (claimant's exhibit 18). To what extent Congress was influenced by the errors in report of the Commissioner of Indian Affairs, is not known.