The **SAC AND FOX TRIBE OF INDIANS
OF OKLAHOMA** et al.

v.

The **UNITED STATES.**

No. 1-61.

United States Court of Claims.

April 5, 1963.

Rehearing Denied June 7, 1963.

George B. Pletsch, Chicago, Ill., for appellants. Dallstream, Schiff, Hardin, Waite & Dorschel, Pritzker, Pritzker & Clinton, Stanford Clinton, Lawrence C. Mills, Chicago, Ill., Louis L. Rochmes, Washington, D. C., and Dempsey, Mills & Casey, Chicago, Ill., were on the briefs.

David M. Marshall, Washington, D. C., with whom was Ramsey Clark, Asst. Atty. Gen., for appellee.

DAVIS, Judge.

This is another interlocutory appeal on behalf of a claimant from a determination by the Indian Claims Commission that the tribe did not possess recognized title to the lands in suit and had aboriginal title only to a part of those lands.

7 Ind.Cl.Comm. 675, Docket 83 (1959).[1] By the Treaty of November 3, 1804, 7 Stat. 84, the Sac and Fox Tribes ceded to the United States a large area extending north and south along the Mississippi and Illinois Rivers in southwestern Wisconsin, western Illinois, and Northeastern Missouri; most of the tract lay immediately east of the Mississippi, but the southerly portion in Missouri was situated west of the river between it and the Missouri. In Royce's numbering, the area is known as Cession or Area 50. Appellants' suit under the Indian Claims Commission Act is for increased compensation for a major part (but not all) of Area 50. They claim here, as they did below, that the Sac and Fox had both a title recognized by the United States and also aboriginal title through exclusive use and occupancy. We affirm the Commission which wholly rejected the argument of recognized title and eliminated two substantial areas from the aboriginal ownership it accorded the Sac and Fox.

### RECOGNIZED TITLE

The general standards for determining recognition are treated in our opinion in Minnesota Chippewa Tribe et al. v. United States, 315 F.2d 906. Congress, acting through a treaty or statute, must be the source of such recognition, and it must grant legal rights of permanent occupancy within a sufficiently defined territory. Mere executive "recognition" is insufficient, as is a simple acknowledgment that Indians physically lived in a certain region. There must be an intention to accord or recognize a *legal* interest in the land.

Three treaties are woven into appellants' claim of such recognition. The first was the Fort Harmar Treaty of January 9, 1789, 7 Stat. 28, with six tribes including the Sacs. The main objective of this agreement was to renew and confirm the boundary line in Ohio which had been established some four years before in 1785 by the Treaty of Fort McIntosh, 7 Stat. 16, between four of these tribes—*not* including the Sac—

1. See also Minnesota Chippewa Tribe, et al. v. United States, 315 F.2d 906.

and the United States. The provisions of the Fort Harmar Treaty directly relating to boundary and land (Articles I–IV, IX) do not refer to or involve the Sac Nation [2] but only the "said nations" (or "those nations") which had signed the earlier treaty of 1785. As signatories, the Sac were concerned only with the other portions of the Fort Harmar Treaty, the articles as to trading, cessation of hostilities, delivery of criminals, and horse-stealing. This is shown by Article XIV, containing the sole mention of the Sac, which declares that the United States "do *also* receive into their friendship and protection, the nations of the Pattiwatimas and Sacs; and do hereby establish a league of peace and amity between them respectively; and all the articles of this treaty, *so far as they apply to these nations*, are to be considered as made and concluded in all, and every part, expressly with them and each of them" (emphasis added). The reference to the other articles of the treaty "so far as they apply to these nations" indicates plainly that the Sac were not affected by the boundary provisions and the land cessions, but only by the other phases. There was therefore no acknowledgment or recognition of Sac ownership of any defined territory.

■ The next treaty—on which the appellants primarily rely—was the Treaty of Greenville of August 3, 1795, 7 Stat. 49, already considered at length by this court in The Miami Tribe of Oklahoma v. United States, 175 F.Supp. 926, 929–931, 146 Ct.Cl. 421, 427–431, (1959). In 1794, "General Anthony Wayne was appointed a commissioner to negotiate a treaty with the hostile tribes of the Northwest Territory. In his treaty instructions it was emphasized that he should attempt to bring about an agreement concerning a dividing boundary line between lands used and occupied by the Indian tribes in the territory and the lands which belonged to the United States. He was also instructed to establish the boundary lines between the lands owned by the separate tribes in the territory. He was authorized to guarantee to the Indian tribes the right to the soil in the lands owned by them as against any citizens or inhabitant of the United States. During the course of the negotiations" with twelve tribes "it became apparent that it would not at that time be possible to persuade the tribes to agree to definite boundaries between their separate areas of occupation and accordingly his treaty instructions were altered to permit him to make a single treaty with all of the tribes establishing the overall boundaries of the land owned by all of them without defining inter-tribal boundaries. The treaty was negotiated at Greenville and executed on August 3, 1795" (175 F.Supp. at 930, 146 Ct.Cl. at 427–428). This treaty established a "general boundary line between the lands of the United States, and the lands of the said Indian tribes," beginning at the mouth of the Cuyahoga River at Lake Erie (where Cleveland is now situated), running across Ohio to what is now Indiana, then southwest to the Ohio River on the border between Indiana and Kentucky to a point about 25 miles west of the Ohio line. The Indians ceded all claims to the land east and south of that line; the United States relinquished, in consideration, all claims to Indian lands (with defined exceptions) north of the Ohio River, east of the Mississippi River, and west and south of the Great Lakes and the waters uniting them. "Although the Treaty of Greenville did not establish boundaries between the lands of the various signatory tribes, the tribal representatives to the treaty understood that the United States was dealing with each tribe independently of the others and that boundaries would be established as between the various tribes by future negotiations" (175 F.Supp. at 931, 146 Ct.Cl. at 431). This was done in the following years (175 F.Supp. at 931–936, 146 Ct.Cl. at 431–438).

■ In Miami Tribe, supra, the Commission and this court held that the

2. The Fox did not participate at all.

Treaty of Greenville, together with the "follow-up" treaties, did accord recognition of the legal right and title *of the signatory tribes* to the lands relinquished by the United States. But neither the Sacs nor the Foxes signed the treaty nor were they present at the negotiations. The general rule is, of course, that an Indian tribe obtains no legal rights from a treaty to which it is not a contracting party. See The Yuchi Tribe of Indians v. United States, 145 F.Supp. 206, 214, 136 Ct.Cl. 433, 448 (1956), cert. denied, 352 U.S. 1016, 77 S.Ct. 558, 1 L.Ed.2d 546 (1957); Potawatamie Indians v. United States, 27 Ct.Cl. 403, 419 (1892). Appellants contend, however, that the Federal Government must have intended, by the Greenville Treaty, to recognize the right of *all* Indian tribes in that area to *all* the land on the Indian side of the general boundary, and therefore to acknowledge the rights of the Sacs and Foxes even though they were not present and did not sign as contracting parties.

We cannot agree with this strained interpretation of the treaty. Under its terms, only the named tribes were to be bound or benefited. The preamble recites that the federal representative met with the agents of "the *said* tribes of Indians" (referring to the twelve signatory tribes) and agreed upon a treaty which, when ratified, was to be binding on the United States "and the *said* Indian tribes" (emphasis added). The reconfirmed boundary was designated as the line "between the lands of the United States, and the lands of the *said* Indian tribes"; the ceded lands were given up by the "*said* Indian tribes"; certain rights of passage for United States citizens were allowed by "the *said* Indian tribes"; trade was to be opened with "the *said* Indian tribes"; the United States and "the *said* Indian tribes" forbade private revenge or retaliation; and previous treaties between the United States and "the *said* Indian tribes, or any of them" were to become void (emphasis added). The United States, as its major concession, relinquished territorial claims "in consideration of the peace now established and of

the cessions and relinquishments of lands made * * * by the *said* tribes of Indians * * *"; and a payment was made "to the *said* Indian tribes," with specified annual allowances to be paid in the future to the twelve signatories by name (emphasis added).

It was quite possible for the Federal Government thus to treat differently the various tribes and tribal lands on the Indian side of the general line, depending upon whether the particular tribe entered into a settlement or came to terms with the United States (at Greenville and later). Indeed, it would be natural for the United States to bind itself only to those tribes which obligated themselves to the United States. We find nothing in the negotiations, or .the treaty instructions, or the general contemporaneous references to the Greenville Treaty as confirming the Indian ownership of Indian lands (in the collective sense) on their side of the line to cause us to modify our statement in Miami Tribe that "the tribal representatives to the [Greenville] treaty understood that the United States was dealing with each tribe independently of the others and that boundaries would be established as between the various tribes by future negotiations" (175 F. Supp. at 931, 146 Ct.Cl. at 431). The other tribes were representing themselves, and not acting on behalf of the Sacs and Foxes, in signing the treaty. Nor were the latter third party beneficiaries of the compact, or somehow brought within its reach by affiliation or association. On the contrary, the contemporary understanding seems clearly to have been that the Sac and Fox Tribes were wholly outside the benefits of Greenville. Governor Harrison of the Indian Territory reported to the Secretary of War in 1802 that the Sacs "were not included in the treaty of Greenville" but "are now extremely desirous to be put on a footing with the other tribes, and receive an annual present, * * *." Just as the Sacs did not receive an annual present under the Greenville treaty because they were not a signatory, so they did not obtain recognition of their title.

As Harrison and the Indians both knew, a further treaty would be required to give the Sacs (and their allies) any benefits or rights comparable to those granted at Greenville.

■ The third treaty appellants invoke is that of November 3, 1804, 7 Stat. 84, which ceded the lands for which higher compensation is now sought. This compact fixed "[t]he general boundary line between the lands of the United States and of the said Indian tribes", and the tribes ceded and relinquished to the United States "all the lands included within the above-described boundary." Article 7 provided that "[a]s long as the lands which are now ceded to the United States remain their [i. e., the United States'] property, the Indians belonging to the said tribes, shall enjoy the priviledge [sic] of living and hunting upon them." But, significantly, the treaty did not contain *as to the ceded lands* any equivalent of Article V of the Greenville Treaty (on which the court placed great stress in Miami Tribe) providing that the signatory tribes were to be protected in the quiet enjoyment of the Indian lands relinquished by the United States "so long as they [the tribes] please." [3] There being no prior recognition of the Sac and Fox title and no indication of such recognition in the 1804 Treaty itself, that treaty must be viewed as no more than a cession agreement which, in order to extinguish all *claims,* reflected in its wording and coverage the broadest assertions of the Indians to the ceded territory but did not acknowledge or recognize that those claims had any substance.[4] See Quapaw Tribe v. United States, 1 Ind. Cl.Comm. 469, 485 (1951), affirmed 120 F.Supp. 283, 286, 128 Ct.Cl. 45, 49–50 (1954); The Iowa Tribe of the Iowa

Reservation, etc. v. United States, 6 Ind. Cl.Comm. 464, 501 (1958). Appellants apparently assume that "recognition" or "acknowledgment" necessarily follow from an acceptance by the United States of the bare fact that the particular Indians dwelt or hunted, or claimed to dwell or hunt, in the area at that time. But there must be another indispensable element before recognition is had. The Congress must affirmatively intend to grant the right to occupy and use the land permanently. "By 'recognition', the courts have meant that Congress intended to acknowledge, or if one prefers, to grant, to Indian tribes rights in land which were in addition to the Indians' traditional use and occupancy rights exercised only with the permission of the sovereign." The Miami Tribe of Oklahoma v. United States, supra, 175 F. Supp. at 940, 146 Ct.Cl. at 445. As this statement shows, in this context "acknowledgment" is a synonym for "recognition" (see also 175 F.Supp. at 936, 146 Ct.Cl. at 439), and both require some affirmative grant or acceptance of more-than-permissive rights. Appellants can point to nothing affording the Sac and Fox Tribes such recognition or acknowledgment of legal rights in the area ceded by them in the 1804 Treaty.[5]

### THE ISSUE OF THE VALIDITY OF THE 1804 TREATY

■■ Although they stand squarely on the 1804 Treaty as recognizing the Tribes' title, appellants nevertheless urge that the Treaty was invalid because not negotiated or signed by proper representatives of the Sac and Fox. At a pretrial hearing the defendant formally stipulated that the treaty "has no validity" of itself but also declared that

3. Article 4 of the 1804 Treaty did contain a comparable provision as to the Sac and Fox lands *retained* by the tribes after the 1804 cession; this provision applied to lands "rightfully" claimed.

4. Cf. Minnesota Chippewa Tribe et al. v. United States, 315 F.2d 906.

5. Appellants, by disavowing any claim to parts of Area 50 (all of which was ceded

by the 1804 Treaty), have themselves indicated that the 1804 Treaty did not, in itself, confer recognition, and that they must either rely on earlier treaties or on aboriginal title. Appellants' brief on appeal (p. 10, fn. 1) states: "The Treaty of 1804 included lands which the Sac and Fox Nation did not, as far as we can determine, own in 1804."

later treaties "validated said treaty of 1804."[6] The Commission, correctly refusing to be bound by a stipulation on an issue of law (Swift & Co. v. Hocking Valley Ry. Co., 243 U.S. 281, 289, 37 S.Ct. 287, 61 L.Ed. 722 (1917)), held that the validity of a properly executed treaty is not open to judicial inquiry even under the Indian Claims Commission Act, and that the Treaty must be deemed fully valid.[7] The parties have argued the point extensively. It seems to us, however, quite unnecessary to decide the question in this case. The only consequence appellant seriously urges as turning on the Treaty's invalidity is that, if it is void, the land ceded would not have been acquired by the United States in 1804 but only at a later time (under post-1804 treaties or when actually disposed of to settlers) and would therefore have to be valued as of that subsequent date. But that conclusion would not follow even if we deemed the 1804 Treaty invalid. If the treaty were invalid, the United States would have unilaterally deprived the Sac and Fox of their lands in 1804, not later; that would be the date of definitive taking, for there could have been little doubt in the minds of the Indians that the United States was continually asserting full ownership of the area after the Treaty.[8] On this assumption of a unilateral taking, appellants' claim under

Section 2 of the Indian Claims Commission Act, 25 U.S.C. § 70a, would be one "arising from the taking by the United States, whether as the result of a treaty of cession or otherwise, of lands owned or occupied by the claimant without the payment for such lands of compensation agreed to by the claimant." The proper valuation date would, as we have said, be the date of deprivation, November 1804. It follows that, whether or not the Treaty was validly negotiated, the taking or acquisition by the United States, and the loss by the Indians, occurred in that year. It makes no difference to this proceeding whether the Treaty was invalid at its inception or whether it is now revised (under the Claims Commission Act) on the ground of unconscionable consideration. In either event the lands found to have been held by the Sac and Fox are to be valued as of 1804, and not thereafter.

### ABORIGINAL TITLE

The remaining question is whether the Indian Claims Commission committed error in holding that appellants, showing no recognized title, also failed to prove aboriginal title to a part of the portion of Cession 50 claimed in this proceeding. The whole area claimed is a relatively narrow elongated tract running north-south along the Mississippi River from about Prairie du Chien, Wisconsin, on

6. The Sac and Fox resented the 1804 Treaty as foisted upon them by a few unauthorized chiefs who obtained far too little compensation for the ceded territory. They complained to federal officials and urgently sought better terms. In the War of 1812 some of the Sacs sided with the British. Although the Tribes entered into treaties in 1815 and 1816 confirming the 1804 compact (7 Stat. 134, 135, 141), the matter was not put to rest. Later treaties in 1824 and 1825 (7 Stat. 229, 272), primarily involving other lands, again attempted to settle (in favor of the United States) the status of the areas ceded in 1804. The feeling of injury subsisted, however, and a part of the tribes continued to refuse to leave the ceded lands. In 1832 armed conflict broke out with settlers and militia in Illinois. The Indians were led by the Sac chief Blackhawk, and the episode is known as Blackhawk's War, in which the

Sac and Fox were finally defeated. It was in this conflict that Abraham Lincoln, as an elected captain of volunteers, had his pre-taste of armed hostility.

7. Putting to one side the effect of the Claims Commission Act, there is much authority that the courts cannot inquire whether a duly promulgated treaty with the Indians was validly consummated by or on behalf of the tribe. See, e. g., Fellows v. Blacksmith, 19 How. 366, 372, 15 L.Ed. 684 (1856); Lone Wolf v. Hitchcock, 187 U.S. 553, 567–568, 23 S. Ct. 216, 47 L.Ed. 299 (1903); United States v. Minnesota, 270 U.S. 181, 201–202, 46 S.Ct. 278, 46 L.Ed. 298 (1926). Cf. Baker v. Carr, 369 U.S. 186, 215–216, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962).

8. By the Act of March 3, 1805, 2 Stat. 343, Congress authorized the ceded lands to be thrown open for sale as public lands. See also footnote 6, supra.

the north, to near St. Louis, Missouri, on the south. The decision below sustained the claimant's aboriginal title to the northern part of this tract as well as to most of the southern portion, but held against the appellants as to the large segment in the middle, as well as a smaller segment in the very south. The large middle area lies between the Illinois and Mississippi Rivers (on the east side of the latter), and the smaller sector lies immediately north of the Missouri River on the west side of the Mississippi. The entire area claimed for the Sac and Fox in this proceeding covers about 9,800,000 acres; of this, about 4,000,000 was awarded below and the remaining 5,800,000 (consisting of a 5,000,000 acre tract and an 800,000 acre tract) were held not to have been owned by the Sac and Fox. The defendant points out that in other proceedings, which are still not final, the Commission has awarded the Sac and Fox large areas on the west side of the Mississippi in Iowa and Missouri, totaling about 18,000,000 acres.[9] The only relevance of this fact—and it is relevant for this purpose—is to show that the two non-contiguous sectors of Area 50 awarded below are not isolated but form the eastern and southern parts of a continuous expanse of territory (in Wisconsin, Illinois, Iowa, and Missouri) determined by the Commission to have belonged to the Sac and Fox; on the other hand, the sectors of Area 50 omitted by the Commission do not make gaps in otherwise solid Sac and Fox territory (as the Commission has found it to be) but, rather, form marked indentations along the edges. Appellants urge, of course, that if the omitted sectors were added the border of these Indians' region would be less indented and more symmetrical.

■ The adverse factual determinations as to the unawarded tracts are challenged on two major grounds: (a) the Commission erroneously rejected, because the documents came after the 1804 Treaty, evidence tending to prove that the Sac and Fox occupied these areas prior and up to 1804; and (b) the Commission's findings are not supported by substantial evidence in the record as a whole. If the Commission had followed the rule, as a matter of law or of policy, of refusing to consider any post-1804 materials as bearing on pre-1804 occupancy, we would be required to reverse. Post-treaty materials can often shed light on the state of affairs prior to the treaty. Their weight may depend upon their closeness in time to the critical date or upon the nearness of the events they describe, but there is and can be no general rule warranting the fact-finder in disregarding en masse all such evidence. They must be considered and cannot be discarded out of hand. We know that in other cases the Commission has correctly taken post-treaty evidence into account in deciding a treaty or a pre-treaty issue. See, e. g., The Sac and Fox Tribe v. United States, Appeal No. 10–61, Ct.Cl., decided Nov. 7, 1962, slip op., 5–6 (involving another Sac and Fox claim). The difficulty with appellants' argument is that, as we read the findings and opinion below, the Commission here followed the same pattern and did not disregard the post-Treaty materials (although it gave them less weight than appellants think they merit). Nowhere does the Commission say that it is refusing to consider post-1804 materials, and several of its findings specifically refer to such evidence. We cannot say that the Commission failed to consider materials which came after the Treaty of 1804 simply because it thought that evidence unpersuasive or overborne by other data.

■ The issue then narrows to whether the Commission's factual findings and determinations on aboriginal ownership of the two excluded segments are sustainable. From the findings and opinion we gather that the Commission based the phase of its determination which was favorable to appellants[10] on proof that

<hr/>

9. These proceedings have not come to this court and can still do so after final determinations are made.

10. The Government has taken no appeal, at this time, from this holding.

the Sac and Fox lived and hunted in the awarded sections of Area 50 for a long time prior to 1804; conversely, the Commission's refusal to find the required use and occupancy in the sections involved in this appeal was mainly based on its view that (a) there was too slight proof of Sac and Fox villages and occupancy in these areas, and also that (b) any Sac and Fox occupancy of the omitted sectors, through living and hunting, was too recent for acquisition of aboriginal ownership since these Indians had entered and driven out other Indians (who had previously possessed the areas) no earlier than the latter part of the 18th century. To be accepted under the Indian Claims Commission Act, aboriginal title must rest on actual, exclusive,[11] and continuous use and occupancy "for a long time" prior to the loss of the property. See The Snake or Piute Indians v. United States, 112 F.Supp. 543, 125 Ct.Cl. 241, 254 (1953); The Quapaw Tribe of Indians v. United States, 120 F.Supp. 283, 285, 128 Ct.Cl. 45, 49, (1954); Alcea Band of Tillamooks v. United States, 59 F.Supp. 934, 965, 103 Ct.Cl. 494, 557, (1945) affirmed 329 U.S. 40, 67 S.Ct. 167, 91 L.Ed. 29 (1946). Each of these components must be shown by adequate proof.

██ To sustain their attack on the adverse findings and determination as lacking substantial support, appellants emphasize three main classes of materials in this record: first, documentary references to Sac and Fox villages and hunting in the excluded sectors, particularly the larger segment between the Illinois and Mississippi Rivers; second, general statements by officials that the Sac and Fox occupied or hunted the areas (especially that between the Illinois and the Mississippi) prior to the 1804 Treaty; and, third, historical data tending to show (appellants say) the non-existence of other tribes in the area and Indian recognition of this territory as belonging

to the Sac and Fox. We canvass these points in turn.

Although the Commission determined that no Sac and Fox village of any significance can be found within the larger excluded area prior to 1804, appellants insist that they have overwhelmingly proved that there were four such villages in that sector, particularly a Henderson Creek village referred to by Lt. Zebulon Pike as "the largest Sac village" (in his notes of his travels up the Mississippi in August 1805). But the Commission was not compelled to accept the existence of these communities, in or before 1804, as proved by the record. With respect to the alleged Henderson Creek village, for instance, there are adequate reasons to doubt the claim—which is largely based on Lt. Pike's account. Pike's reference was admittedly hearsay since he simply says that on August 23, 1805, he was "informed" by unnamed visitors to his boat on the Mississippi "that the largest Sac village was about 2½ miles out on the prairie"; the "Henderson Creek village" could not have been "the largest Sac village" since at that time the largest village (by far) was undoubtedly Saukenuk on the Rock River some 75 miles to the north in an area awarded by the ruling below to the Sac and Fox; and the well-known Sac and Fox Indian agent Thomas Forsyth referred in 1824 to the Henderson Creek location as the site of a "small Sauk [Sac] village * * * built in May" *1824* (twenty years after the cession).[12] The issue for us, of course, is not where the preponderance of the evidence lies, but whether there is substantial evidence in the record as a whole to support the Commission's adverse finding as to this village. Applying that standard, we cannot say that the Commission had to accept appellants' evidence on this point, subject as it was to so great a possibility of error. The same is true as to three other villages in the larger excluded area

---

11. Except where two or more tribes or groups inhabit a defined area in joint and amicable possession.

12. The only other recorded reference to such a village is by the Sac and Fox leader Blackhawk who wrote much later that he visited such a village in *1815*.

which the appellants now urge as proved. We do not stop to detail the evidence, which is exhaustively discussed in the parties' briefs, but it is plain that the Commission had even more reason to find against the existence of these Sac and Fox communities prior to the 1804 Treaty.[13]

The second main type of material which appellants proffer to us as invalidating the Commission's adverse findings consists of general statements, around and after 1804, by prominent American officials that the Sac and Fox hunted in, occupied, possessed, owned, or claimed territories which necessarily included either or both of the omitted segments. In submitting the 1804 Treaty to the Senate, President Jefferson said that the Sacs "own the country in the neighborhood of our settlements of Kaskaskia and St. Louis"[14]; General Harrison (who negotiated the Treaty) told the Secretary of War in 1802 that the Sacs were a "considerable nation who reside between the Illinois River and the Mississippi" and in 1814 he wrote that as of the first part of the 19th century "the Sacs remained masters of the country to the north" of the Illinois River[15]; Secretary of War Dearborn, in empowering General Harrison to negotiate with the Sac

and Fox in 1804, authorized him to obtain cessions "on both sides of the Illinois * * * they ought to relinquish all pretensions to any land on the southern side of the Illinois, and a considerable tract on the other side, * * * *"; Captain Meriwether Lewis reported in 1806 (after the Treaty) that the Sac and Fox still claimed the land on the east side of the Mississippi to the Illinois River and that "their principal hunting is on both sides of the Mississippi, from the mouth of the Ouisconsin [Wisconsin River] to the mouth of the Illinois River"; Lt. Pike described the Sac and Fox, in 1810, as hunting on both sides of the Mississippi in a region which encompassed both of the omitted sectors.

▇▇ It would have been better if the Commission had dealt specifically with these statements, for materials of this kind have a direct bearing on the factual question of aboriginal title. See, e. g., The Snake or Piute Indians v. United States, 112 F.Supp. 543, 552, 125 Ct.Cl. 241, 254 (1953). But on this record the Commission was not barred from deeming the statements insufficiently probative. For one thing, the phrasing of some of them is not very helpful to appellants: Secretary Dearborn's instruction to General Harrison is so ambiguously worded

13. A related argument by appellants is that under the Commission's determination the large Sac village of Saukenuk (which was situated at the southern end of the northern portion of Area 50 awarded below to the claimant) would have been left as an exposed Sac and Fox enclave on the east side of the Mississippi—without supporting hunting lands to the south and without the military protection of Sac and Fox country to the south. The suggestion is that the Sac and Fox would never have left their "capital" in such a precarious position —from both the defensive and the subsistence points of view—but would certainly have taken over the adjoining land to the south (which lies in the excluded sector between the Mississippi and Illinois Rivers). One answer the Commission could adopt is that this village lay directly across the Mississippi from large Sac and Fox territory in Iowa (not involved in this proceeding), including another large village, and was therefore not

isolated on the west or north upon which it could draw both for protection and for food. In addition, the Commission could find that Saukenuk had a sufficient area immediately surrounding it, as well as a large area to the north (even if the west side of the Mississippi be omitted from consideration), for the subsistence needs of its population; and since there is no showing of *strong* hostile Indian forces to the south, in the excluded sector, the chiefs could have been content to let that sector remain unoccupied or only lightly infiltrated from time to time.

14. The reference to Kaskaskia would include, appellants say, the southern part of the larger excluded segment, and the reference to St. Louis might cover the smaller excluded segment (but not necessarily so).

15. The land between the Illinois and the Mississippi (and similarly the land north of the Illinois) lies in the larger excluded segment.

that it may well refer to Sac and Fox *claims* rather than to accepted ownership,[16] and President Jefferson's acknowledgment of Sac ownership is so general that it could cover very little, if any, of the excluded areas. The relevant statements of General Harrison, Captain Lewis and Lt. Pike are more definite, but there are two interrelated grounds upon which the Commission could reject them as persuasive of Sac and Fox aboriginal title prior to 1804.[17] The first is that Article 7 of the 1804 Treaty, 7 Stat. 86, permitted the Sac and Fox to enjoy the privilege of living and hunting on the lands then being ceded until they were disposed of; reports of Sac and Fox hunting after 1804 would not, therefore, necessarily carry any solid implication as to pre-Treaty hunting. The second, and more important, reason is that these statements do not show that the Sac and Fox had hunted or controlled the disputed areas for *"a long time"* before 1804. We know, as the Commission pointed out, that the Sac and Fox settled in their primary village of Saukenuk and in the northern part of Area 50 (both awarded to them below) as early as the 1730's. But we also know that they did not begin to drive the Illinois tribes out of the large excluded segment to the south of this awarded area until after 1760, and that other Indian tribes were engaged in the same endeavor. Intertribal conflict for the territory left by the retreating Illinois Indians apparently continued for some time (see the discussion, *infra*). Assuming that the Sac and Fox emerged generally victorious toward the end of the 18th century, a trier of fact could properly decide that such a late conquest would not ripen into aboriginal title by 1804. The status of aboriginal ownership is not accorded to tribes at the very instant they first dominate a particular territory but only after exclusive use and occupancy "for a

long time." This is as it should be—especially under the Indian Claims Commission Act which is the charter for doing justice between the Indians and the United States. Justice would not be vindicated if a tribe were able to claim a monetary award, on the ground that it was unfairly deprived by the Government of its original ownership of property, where the lands were but recently seized by conquest from another tribe. The rights of aboriginal title must have time to take root, transforming a conquered province into domestic territory. The Claims Commission Act, which seeks to repair damage caused by United States conquest of Indian lands, should not be turned into an engine for creating aboriginal title in a tribe which itself played the role of conqueror but a few years before.

On this facet of the case appellants urge that the unfavorable findings and determination are inconclusive because the Commission erred in thinking that there were other Indians inhabiting or claiming the disputed areas before 1804. Here, too, the lateness of the Sac and Fox mastery of the region—if those allied tribes did in fact control it by the first years of the 19th century—warranted the Commission in pointing to the conflicting claims and usages of neighboring tribes as bearing on the claimant's original title. The Illinois Indians were not driven out until the late 1760's; and thereafter the Potawatomis definitely claimed some of the disputed sections of the ceded parts of Area 50 (as well as others) adversely to the Sac and Fox and not jointly with them. In addition, in the latter part of the 18th century, there are references to two Iowa villages on the east side of the Mississippi in Illinois—in the larger disputed segment —which at the least indicate some Iowa possession.[18] As for the smaller excluded

---

16. Part of Captain Lewis's statement is also a simple repetition of Sac and Fox *claims*.

17. Defendant makes other points as to the defects in these statements, but we need not detail them.

18. The Commission was justified in referring to the testimony of appellants' expert witness (Dr. Wallace), in related proceedings before the Commission, to support the conclusion that two Iowa villages probably existed on the east side of the

segment, there is likewise evidence of warfare between the Osages and the Sac and Fox sufficiently close to 1804 that the Commission could decide that a conquest by the latter, if it occurred before 1804, was too recent to ground a proper claim of aboriginal title; moreover, it is a fair inference that this conflict had not subsided by the time of the Treaty of 1804 since Article 10 of the Treaty embodies the Sac and Fox solemn promise and agreement "that they will put an end to the bloody war which has heretofore raged between their tribes and those of the Great and Little Osages." 7 Stat. 86. See also Iowa Tribe v. United States, 6 Ind.Cl.Comm. 464, 489, 508–509 (1958).[19] In sum, the Commission was not compelled by the record to find that the Sac and Fox had an exclusive and unchallenged claim to the disputed areas for the required span of time before 1804; other tribes were in the vicinity, at least until the closing years of the 18th century.

■■■ We conclude, for all these reasons, that the Commission could make the determination and findings it did as to the two excluded sectors. At this stage of litigation under the Indian Claims Commission Act it is, of course, redundant to say that on factual issues we are required to sustain the Commission if its resolution of the controversy is supported by substantial evidence in the record as a whole. The Sac and Fox Tribe v. United States, Appeal No. 10–61, Ct.Cl., decided Nov. 7, 1962, slip op. 6; Yakima Tribe v. United States, Appeal No. 4–61, Ct.Cl., decided Oct. 3, 1962, slip op. 11, 19–20; and cases cited. Although briefs are often written as if we could weigh the evidence independently, we are powerless to do so. Confining ourselves to our own sphere, we can and do hold that there is sufficient substantial evidence in the record considered as a whole to sustain the refusal of the Commission to find that appellants' predecessors had aboriginal title to the two omitted sectors of Area 50.

The determination of the Commission, insofar as it is challenged on this appeal, is affirmed.

JONES, Chief Judge, REED, Justice (Ret.) sitting by designation, and DURFEE and LARAMORE, Judges, concur.

Mississippi before 1804. United States v. Pink, 315 U.S. 203, 216, 62 S.Ct. 552, 86 L.Ed. 796 (1942).

19. Appellants make the point that the Kickapoos must have "recognized" Sac and Fox ownership of the larger disputed area because, after 1819, when the former ceded their lands (on the south side of the Illinois River) to the United States, they sought and received permission from the Sac and Fox to cross the Illinois and live on the north and west side of the river. This was almost 15 years after the 1804 Treaty which had given the Sac and Fox federal permission to hunt and live in the territory being ceded; also, the exact nature of the arrangement between the tribes is very unclear. The Commission could justifiably regard this piece of evidence as having little probative impact on the status of the aboriginal title at the time of the treaty.