Davis, Judge,
delivered the opinion of the court:
Appellants represent the Six Nations — tbe league of Senecas, Cayugas, Onondagas, Oneidas, Mohawks and *902 Tuscaroras who lived in parts of western New York and Pennsylvania during colonial times. They sue in this case under the Indian Claims Commission Act, 25 U.S.C. § 70a, for the value of two tracts of land sold by the Six Nations in the 1780’s for an allegedly unconscionable consideration. The larger area was transterred to the Commonwealth of Pennsylvania, not to the United States, but the charge is that the United States had such a relationship to the Six Nations, and to the sale, that it should be held liable under the Act for any inadequate payment. The smaller tract was transferred by the Indians both to the United States and to Pennsylvania. Treating the two areas separately, the Indian Claims Commission rejected both aspects of the claim. We affirm.
NORTHWESTERN PENNSYLVANIA
In the Revolutionary War, the major part of the Six Nations came to side with the British, while a minority aided the newborn nation. The Treaty of Paris of 1783 did not refer to Britain’s Indian allies nor provide for peace between them and the United States. The Continental Congress resolved, in that same year, to treat with the Indians in order to make peace and to establish a boundary for Indian territory outside of the limits of the original state®. Commissioners for the United States were appointed in March 1784 and the meeting with the Indians took place at Fort Stanwyx (now Rome, New York) in October of that year. As a result of the negotiations, the United States concluded, on October 22nd, a peace treaty with the Six Nations (called the Treaty of Fort Stanwyx), 7 Stat. 15. Under this pact, the Indians relinquished to the United States all claim to territory west of Pennsylvania (but also including the “Erie Triangle”, to be discussed separately in the second part of this opinion). None of the area thus given up by the Indians to the new nation was within Pennsylvania as it was then bounded; the entire cession lay outside of that state. In these proceedings, appellants press no claim for any of this territory (except the Erie Triangle).
The bulk of the present claim arises out of other happen *903 ings at Fort Stanwyx in October 1784, connected with the Indians’ dealings at that time and place with the Commonwealth of Pennsylvania. The proprietors of that colony had long followed the practice of 'buying land within its borders from Indians who claimed it as their own. After independence, the state pursued the same policy. Under Article IX of the Articles of Confederation, the “United States in Congress assembled” had the exclusive right of “regulating the trade and managing all affairs with the Indians, not members of any of the States, provided that the legislative right of any State within its own limits be not infringed or violated * * *” (emphasis added). Pennsylvania’s legislature advised Congress, when the latter was considering making peace with the Six Nations, that the state intended to negotiate with this same Indian group for the purchase of land within Pennsylvania. Congress responded by directing that Pennsylvania be notified of the time and location of the federal peace negotiations so that the state’s representatives “may attend for the sole purpose of making such purchase”; the United States commissioners were “instructed to give every assistance in their power, to the commissioners who may be appointed on the part of Pennsylvania, towards promoting the interest of that State, as far as the same may consist with the general interest of the Union * * *."
At Fort Stanwyx, the treaty between the United States and the Six Nations was taken up first. The Pennsylvania delegates attended this part of the meeting as spectators but did not participate at all. Toward the conclusion of these negotiations, the state’s representatives asked the United States commissioners to introduce them formally to the Indians. This was done in a statement which indicated that the Pennsylvania commissioners had “come by the consent of Congress” to “transact some affairs with you, on the part of that state * * *." The Union delegates took no part in the ensuing deliberations between the Indians and the state, nor did they advise either side.
The Indians agreed to sell to Pennsylvania a large tract within its borders (the northwest quadrant of the state) *904 of about eight million acres.[1] In exchange, the Six Nations were given goods probably worth some $4,000, plus an agreement to deliver $1,000 in goods a year later. The present claim is for the worth of this territory (designated by Royce as Area 1) which was always encompassed within the boundaries of Pennsylvania and never formed any part of the public lands or domain of the United States.[2]
It goes almost without saying that the Indian Claims Commission Act redresses Indian grievances against the United States, not injuries done by others for which the United States cannot rightly be held responsible. Cf. The Seminole Nation of Indians v. United States, 125 Ct. Cl. 375, 377-78, 112 F. Supp. 231, 232 (1953). The Act did not intend to impose on the United States liability for all detriments visited upon the Indians during the past two centuries. The claimant must tie the central government to the damage — not rest content with a showing that a hurt was inflicted by someone. Cf. The Ottawa Tribe v. United States, 166 Ct. Cl. 373, cert. denied, 379 U.S. 929 (1964); Citizen Band of Potawatomi Indians v. United States, 3 Ind. Cl. Comm. 10 (1954). Appellants fashion two main chains of argument, one broad and one narrow, for linking the Federal Government to the Pennsylvania purchase of 1784.[3]
At its broadest, their position seems to be that the central union was, even in 1784, a fiduciary toward these Indians, *905 with the affirmative obligation to prevent an unequal or unfair exchange of their lands, even though the United States may have played no material role in the transaction. In a companion case (Part II of the opinion in Seneca Nation v. United States, Appeal No. 14-63, decided today, post, 917, 921) we hold that, in and after 1790, the Federal Government did assume such a responsibility, but we discern no basis for imposing that status on the United States, as of 1784, with respect to lan'ds within the states.[4] The majority of the Six Nations had confederated with the British and were technically enemies until the Treaty of Fort Stanwyx became effective; this enemy status would be enough to preclude the implication of a fiduciary relationship unless there were affirmative action by the Congress to show otherwise. The Continental Congress adopted no legislation shouldering such a burden; the Congressional concern was centered on Indian lands outside the states. The resolution calling for peace negotiations with the Indians expressly provided that “the preceding measures of Congress relative to Indian affairs, shall not be construed to affect the territorial claims of any of the states, or their legislative rights within their respective limits * * Indeed, the portion of the Articles of Confederation dealing with Indian affairs — quoted above — may have deprived the Congress of the power to oversee the Six Nations’ dealings with Pennsylvania with respect to lands within its boundaries. There is much in the history of the times demonstrating that the states were jealous of their right to negotiate with their own Indians. Pennsylvania was deferential but firm in this insistence; in its dealings with the Six Nations, New York acted as if the Federal Government were an unwonted interloper to be kept beyond the gates.[5]
Appellants say, nevertheless, that the Treaty of Fort *906 Stanwyx — signed immediately prior to the negotiations with Pennsylvania — made the United States responsible, at once, for preserving the Indians’ interests as against third parties (including the states). But the most significant part of the treaty was merely a peace pact reciting (7 Stat. 15) that “The United States of America give peace to the Senecas, Mohawks, Onondagas and Cayugas, and receive them into their protection upon the following conditions.” This was a common provision designed to substitute the United States Worcester v. Georgia, 6 Pet. (31 U.S.) 515, 551-52 (1832). It did not, by itself, create any fiduciary relationship. Kansas Indians v. United States, 80 Ct. Cl. 264, 301-02 (1934), cert. denied, 296 U.S. 577 (1935); Omaha Tribe v. United States, 6 Ind. Cl. Comm. 68, 71-72 (1957). The statement of the United States treaty commissioners — “Congress is now your only protector. * * * So long as you conduct yourselves like good children so long you may all rely on the parental protection of the United States”- — rises no higher. The Indians were simply being told that they could no longer look to Great Britain, as in the past, but must now deal with, and accommodate themselves to, the new nation. Article III did provide, after spelling out the bounds of the ceded lands, that the Six Nations “shall be secured in the peaceful possession of the lands they inhabit east and north” of the territory they were giving up to the United States. In context, this meant no more than that the new sovereign would not take the remaining lands for itself; there was no promise to preserve the Indians against bad bargains with others. For the federal delegates to have agreed to protect the Indians’ lands (within state boundaries) as against the states might well have contravened Article IX of the Articles of Confederation, as well as the Congressional prohibition against affecting “the territorial claims of any of the states, or their legislative rights within their respective limits * * *."[6] We find nothing, in short, in the text of *907 the treaty or the treaty negotiations implying or acknowledging that the United States would thereafter guard the Six Nations in their transactions with the states or private individuals.[7]
In addition to this broad claim of a general guardianship, appellants urge the narrower position that the United States was a participant in and beneficiary of the sale to Pennsylvania to such an extent that it should be held liable for a failure by the state to deal fairly, conscionably, and honorably with the Six Nations. Support for this contention is sought in the background and the results of the negotiations at Fort Stanwyx, but all the elements cited to us are too remote and tangential to warrant a finding that the United States was such a direct participant or beneficiary. Inferences are drawn from the insistence of Congress that the Six Nations should not deal with a state without Congress’s consent; this meant, however, no more (for lands within a state’s boundaries) than that the making of peace should precede state-Indian business transactions and that the Union’s problems should be settled before those of the states. We are referred, too, to a number of general mutual interests shared by the two sovereigns. It is pointed out that both the United States and Pennsylvania wanted and needed peace with the Indians, and that both desired vacant land for bounties to ex-soldiers, for grants or sales to immigrants, and as resources from which to service national and state debts. Both governments were interested in the price to be paid for Indian lands, and the United States, which wished to obtain a free cession (west of Pennsylvania) on the ground of the Six Nation’s enemy status, exhibited some advance concern with the Pennsylvania purchase if it were to be consummated prior to the federal treaty. But such parallelism of ultimate goals would not turn the United States, in the absence of a more direct connection, into a participant or partner in Pennsylvania’s trans *908 action. It would stretch the Indian Claims Commission Act far too much to read it as covering every transaction in which the United States’ interest was of the same order as that which one potential purchaser of real estate has in the dealings of another buyer in the same market. If the United States is to be charged with dealings for which someone else appears on the surface to be responsible, there must be a showing of true concert, partnership, or control on the part of the Federal Government.[8] Similarly, the Act does not become applicable simply because the Federal Government may indirectly or ultimately benefit, in some political or social sense, from the conduct of states or private individuals toward the Indians.
Appellants rely, also, on the actual course of the proceedings at Fort Stanwyx to show federal participation in the sale to Pennsylvania. But on this phase of their argument, they cannot hurdle the Commission’s factual findings that (a) the Pennsylvania delegates did not participate in the Indians’negotiations with the United States; (b) conversely, “the United States representatives took no part in the deliberations between the Pennsylvanians and Indians, except for a short ceremonial speech to the Indians on the last day of the conference, after all details of the agreement between Pennsylvania and The Six Nations had been settled”; (c) “The United States representatives did not take part of, or presume to advise, either party to the detriment of the other,” but abstained impartially from the negotiations; and (d) *909 “The United States did not impose any pressure upon the Indians to give particular consideration to Pennsylvania’s wishes.”: These findings are fully supported in the record and are wholly consonant with the distribution (in Article IX of the Articles of Confederation) of power, between' the new federal government and the states, over dealings with the Indians. The main point raised against the findings is that the federal representatives, during their negotiations, coerced the Indians by threatening to “crush” them, by allowing the Pennsylvania delegates to stress that, as former enemies, they had already lost their property, and by insisting on a greater cession to the United States than the Nations had offered; this initial “coercion” is said to have helped pressure the Indians into subsequently accepting Pennsylvania’s terms. The Commission was free to discount this alleged duress because, among other reasons, there was evidence, on the one side, that Pennsylvania, despite the Indians’ enemy status, clearly expressed its willingness to pay “a valuable consideration” for the land, and, on the other, that, the Indians passed over “with very little notice” the statements that they had already lost the territory.
Our conclusion as to the area sold to Pennsylvania in 1784 is that the Six Nations have no rightful claim against the United States, either under clause (3) (revision of treaties with the United States) or under clause (5) (“fair and honorable dealings”) of Section 2 of the Indian Claims Commission Act. For this territory, the United States did not have any “special responsibility” or a “special relationship” to the Six Nations (cf. The Oneida Tribe of Indians v. United States, 165 Ct. Cl. 487, cert. denied, 379 U.S. 946 (1964)), and cannot be held responsible for the state’s bargain.
THE ERIE TRIANGLE
The “Erie Triangle” is the area of some 202,000 acres (including the City of Erie) in the very northwestern comer of Pennsylvania, jutting north of the rest of the Pennsylvania-New York border and giving the state a good coast along Lake Erie. For our purposes, it is unnecessary to detail the manner in which this tract became part of Pennsyl *910 vania, to which it did not originally belong. It is enough to say that the United States sold it to the state in 1789. As noted above, in the Treaty of Fort Stanwyx the Six Nations had ceded this land, together with other territory, to the United States. This cession was reaffirmed, in effect, in the Treaty of Canandaigua, in November 1794, 7 Stat. 44. Pennsylvania also acquired the area from these Indians in 1789. Appellants’ claim for the value of the Erie Triangle was rejected by the Indian Claims Commission because of a failure to prove that the Six Nations had Indian title to the segment.
The legal standard for testing aboriginal title has been stated many times. See, e.g., Red Lake, Pembina and White Earth Bands v. United States, 164 Ct. Cl. 389 (1964); Sac and Fox Tribe of Indians v. United States, 161 Ct. Cl. 189, 201-02, 315 F. 2d 896, 903, cert. denied, 375 U.S. 921 (1963). The appellants must prove actual, exclusive, and continuous use or occupancy for a long time. Whether they have met these conditions presents an issue of fact on which the Commission’s findings must be upheld if supported by substantial evidence. Red Lake, Pembina and White Earth Bands v. United States, supra; Spokane Tribe of Indians v. United States, 163 Ct. Cl. 58 (1963); Sac and Fox Tribe of Indians v. United States, supra, 161 Ct. Cl. at 207, 315 F. 2d at 906. We canvass the record to see, not what we would decide dé novo, but whether there is adequate support for what the Commission found. The gist of that determination was that the Six Nations had no settlements in the area or nearby; that other Indians lived intermittently in the triangle (and the vicinity) and passed through the area; and that use of the tract by the Six Nations (if there was any) was, at most, as a transitory passageway in common with these other tribes.
There is no doubt that the Commission was correct in finding that the Six Nations did not reside within the Erie Triangle at. or near 1784. They were not nomads, but lived in substantial villages near which they raised crops, hunted, and traded furs. There is no record, however, of one of their villages or settlements being in this area in or around the 1780’s; even the references to earlier habitations are *911 ambiguous and doubtful. When Pennsylvania acquired the tract from the Indians in 1789, the chiefs thought that it included some Six Nations villages and therefore reserved those settlements from the cession, but it was later determined that the chiefs were mistaken as to the location; all of the villages lay in New York, well east of the triangle. Appellants claim the village of Conneaut (the Commission disagreeing) but even that was about 10 miles west, in what is now the State of Ohio.
There is, likewise, sufficient support for the Commission’s companion conclusion that members of the Six Nations did not reside nearby for the necessary period, and that other Indians used the region as much or more than the Nations. Substantial evidence indicated that Conneaut was occupied by both Senecas and Mississaugas and that it was probably not even in existence in 1784. The evidence as to the existence, in 1784, of a Seneca village called Charage (in Ohio) is also tenuous. All of the Six Nations’ settlements which were reserved from the cession to Pennsylvania turned out to be in New York, quite a distance from the true triangle— even outside the larger area (of 700,000 or 800,000 acres) which was at one time mistakenly supposed to constitute the Erie Triangle. In addition, the historical records show that, during the 18th century, Cbippewas, Ottowas, Mississaugas or Lake Indians were found from time to time within the Triangle, and some of these as well as other Indians (Shawnees, Delawares) appeared in the contiguous region of Pennsylvania. The Commission was not required, on this record, to credit appellants’ dubious claim that the Iroquois (the Six Nations) somehow controlled all of these other Indians to such an extent that the Six Nations should be held to be the exclusive users or occupiers of the whole territory.
The parties have argued at length over the impact and meaning of the various items of evidence. We do not stop to analyze each contention separately. It is quite clear that the Commission’s factual finding as to the lack of proof of the Six Nations’ title to the Erie Triangle — the failure to show actual, exclusive and continuous use or occupancy for a sufficient period — is sustained by substantial evidence in the record as a whole.
*912 On both aspects of tbe proceeding, the Commission’s determination must be upheld.

Affirmed.

 This area included all land -within the state’s colonial boundaries that had not been bought from Indian tribes or individual Indians before the Revolutionary War.
Pennsylvania later purchased this very same area from the Wyandots and Delawares, who also claimed it. For this reason, among others, the appellee claims that, in any event, the Six Nations did not have aboriginal title to the territory. The Indian Claims Commission found it unnecessary to pass upon this contention, as do we.

 When the colonies became independent, title to the land vested in Pennsylvania, not the united States. See Harcourt v. Gaillard, 12 Wheat. (25 U.S.) 523, 526 (1827); Clark v. Smith, 13 Pet. (38 U.S.) 195, 201 (1839); Martin v. Waddell, 16 Pet. (41 U.S.) 367, 410 (1842); Massachusetts v. New York, 271 U.S. 65, 85-86 (1926).

 Clause 3 of Section 2 of the Act, 25 U.S.C. § 70a, provides for revision of “treaties, contracts, and agreements -between the claimant and the United States * * * on the ground of fraud, duress, unconscionable consideration, mutual or unilateral mistake, whether of law or fact, or any other ground cognizable by a court of equity” (emphasis added). A minor contention of appellants’ would apply this clause by disregarding the phrase “between the claimant and the United States.” The plain words and purpose of the statute forbid this drastic emendation.

 See, also, Part I of the opinion in Seneca Nation v. United States, Appeal No. 14-63, post, 917, 920.

 The Commission’s well-supported finding is that the New York delegation to the Port Stanwyx meeting “seemed determined to frustrate united States negotiations.” For instance, when the Indians insisted on treating first with the federal representatives, the New Yorkers left a delegate and an interpreter with instructions “to observe the Conduct of the Commissioners of Congress in their proposed Treaty * * *. You will * * * find out the Objects they have in View; and where You find they have in View anything that may eventually prove detrimental to the State, You are to use your best Endeavours to counteract and frustrate it.”

 Article II of tlie treaty provided that the Oneida and Tusearora Nations (which had helped the states during the Revolution) “shall be secured in the possession of the lands on which they are settled.” If this separate provision is thought to have had greater meaning for these friendly tribes, it is enough to note that the lands on which they were settled did not include the Pennsylvania territory with which this case is concerned.

 There Is significance in the specific reasons given for the declaration (in Article IV) that the united States “will order goods to be delivered to the said Six Nations for their use and comfort.” The treaty bases this provision upon “consideration of the present circumstances of the Six Nations, and in execution .of the humane and liberal views of the united States upon the signing of the above articles.” This is the language of gratuity, not of a fiduciary toward his ward or protege.

 The Congressional instructions to the united States treaty commissioners to cooperate with Pennsylvania — “to give every assistance in their power, to the commissioners who may he appointed on the part of Pennsylvania, towards promoting the interest of that State, as far as the same may consist with the general interest of the Union” — seems to have sprung from appreciation for Pennsylvania’s deference to the federal interests and the state’s expressed desire not to allow its own views to interfere with the authority of the United States. Pennsylvania’s delegates were likewise instructed to coordinate their activities with those of the federal commissioners. (New York, in contrast, sought adamantly to pursue its own dealings with The Six Nations and their constituents, without regard to the wishes or interests of the Federal Government.) These mutual directives to exchange courtesies and avoid conflicts cannot be escalated into a joint venture for dealing with the Indians. As shown by the record of the proceedings at Fort Stanwyx, the United States representatives did not participate in Pennsylvania’s transaction and the state’s delegates stood aside from the Union’s negotiations. This was not a formal or camouflaged non-participation, but reflected the independent positions of the two governments.